1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA
* * *

UNITED STATES OF AMERICA,       )
                                )
              Plaintiff,         )       Case No. 2:11-cr-00347-KJD-CWH
                                )
vs.                             )       **FINDINGS AND RECOMMENDATION**
                                )
HENRI WETSELAAR, M.D., *et al.*, )
                                )
              Defendants.        )
                                )
_____)

This matter was referred to the undersigned Magistrate Judge on Defendants Henri Wetselaar,
M.D., and David Litwin's ("Defendants") Omnibus Motion (#65), filed on March 27, 2013.  The Court
also considered the Declaration of Jeffrey Settness in Support of the Omnibus Motion (#68), filed on
March 27, 2013, the Government's Response (#84), filed on April 19, 2013, and Defendants' Reply (#90),
filed on May 10, 2013.  Additionally, the Court considered Defendants' Motion for *Franks* Hearing (#95)
and Exhibits (#96), filed on June 4, 2013.  On June 10, 2013, in accordance with the Court's June 5, 2013
Order (#98), Defendants re-filed their Motion for a *Franks* Hearing (#99).  The Court also considered
Exhibits to the Motion (#100), filed on June 10, 2013, the Government's Response (#101), filed on June
17, 2013, and Defendants' Reply (#102), filed on June 20, 2013.

## BACKGROUND

On March 27, 2013, Defendants filed an Omnibus Motion (#65) requesting suppression of the
results of ten searches and seizures that occurred between August 31, 2010 and October 5, 2011.  This
Report and Recommendation only addresses the portion of Defendants' Omnibus Motion (#65) that
requests a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978).  On June 3, 2013, during an
evidentiary hearing on the Omnibus Motion (#65), Defendants raised a *Franks* issue.  The Court ordered
that a separate motion as to the *Franks* issue be filed by Tuesday, June 4, 2013.  As a result, Defendants

filed their Motion for *Franks* Hearing (#95) on June 4, 2013. In doing so, Defendants requested an evidentiary hearing to challenge the search warrant affidavit of Task Force Officer Kendra Still. In addition, Defendants asserted that they may supplement their challenge to the search warrant affidavits of Robert Norris as stated in their Omnibus Motion (#65) and Reply (#90) with further proof that may arise at a later evidentiary hearing. As such, Defendants relied on scattered allegations in the Omnibus Motion (#65) and Reply (#90), an oral statement during the June 3, 2013 evidentiary hearing, and a new list of 13 alleged false statements and material omissions provided in Motion #95 along with 11 new exhibits. Accordingly, on June 5, 2013, the Court ordered Defendants to re-file their request for a *Franks* hearing as a supplemental motion identifying all of the affidavits being challenged along with a detailed offer of proof and pinpoint citations to the alleged false statements and a clear articulation of the misleading omissions. *See* Order #98. Defendants re-filed their Motion for *Franks* Hearing (#99) on June 10, 2013.

In the re-filed Motion (#99), Defendants claim that a *Franks* hearing is warranted because three Affidavits of IRS Special Agent Norris ("Norris") contain false statements and misleading omissions. In addition, Defendants contend that a *Franks* hearing is warranted because one Affidavit of Task Force Officer Kendra D. Still ("Still") contains false statements and misleading omissions. In response, the Government contends that this Motion was untimely and fails to make the substantial preliminary showing required to grant a *Franks* hearing.

## DISCUSSION

### I.    Timeliness of the Motion for *Franks* Hearing

The deadline for filing dispositive motions was March 27, 2013. *See* Order #51. Defendants filed their Omnibus Motion (#65) that same day, which raised a *Franks* issue. Defendants allege that they were unable to include all of their allegations with respect to false statements and misleading omissions in their Omnibus Motion (#65) because they received Still's Grand Jury Transcript on April 23, 2013 and copies of 330 patient records on May 30, 2013. Defs' Mot. #95, 2; Defs' Reply #102, 3. Defendants contend that any timeliness problem is excusable due to the Government's delay in releasing these records. As

a result, Defendants request that the Court consider all of the allegations raised in the Omnibus Motion (#65), Reply (#90), oral proffer on June 3, 2013, Motion (#95), re-filed Motion (#99), and Reply (#102).

The Government argues that Defendants' request for a *Franks* hearing is untimely. In doing so, the Government highlights the fact that Defendants raised novel arguments as to the alleged false statements and misleading omissions at the June 3, 2013 evidentiary hearing. The Government also argues that the re-filed Motion (#99) contains additional alleged statements or omissions.[1]  More specifically, the Government alleges that three of the twelve are "tangentially related to the recently received medical records or TFO Still's grand jury transcript" while the other nine are supported by items produced in discovery that could have been obtained before the dispositive motions deadline. Govt.'s Resp. #101, 5. Further, the Government contends that they disclosed the grand jury transcript early based on the parties' joint scheduling order, which obligates the Government to provide Defendants with a witness' Jencks Act statement twenty-one days prior to trial, rather than late as suggested by Defendants. As a result, the Government requests that the Court dismiss at least nine of the new allegations in the re-filed Motion (#99) as untimely.

The Court agrees that Defendants request for a *Franks* hearing prior to the dispositive motion deadline is procedurally improper.[2]  The Court is not persuaded by Defendants' only explanation for their untimely supplement of additional allegations as the Government's disclosure of Still's grand jury transcript and patient records complied with the scheduling order. Nevertheless, the Court will consider this issue on the merits to determine whether Defendants have made the substantial preliminary showing required to justify a *Franks* hearing.

---

[1] The Court notes that Defendants have added new arguments with respect to why a *Franks* hearing is warranted at every opportunity, beginning with the Omnibus Motion (#65), at the June 3, 2013 hearing, and continuing through their Reply (#102) to the re-filed Motion (#99).

[2] The Court notes that Special Order #109 outlines the procedures for utilizing the CM/ECF System. It specifies that a "separate document must be filed for each type of document or purpose . . . Motions may ask for only one type of unrelated relief." Special Order #109(III)(F)(4). Accordingly, Defendants violated Special Order #109 by failing to file a separate motion requesting a *Franks* hearing.

## II.     Substantial Preliminary Showing

In *Franks v. Delaware*, the Supreme Court established a two-prong test for challenging the sufficiency of a search warrant affidavit.  438 U.S 154.  The Court noted that there is a "presumption of validity with respect to the affidavit supporting the search warrant."  *Id.* at 171.  A defendant is entitled to an evidentiary hearing on the validity of the affidavit underlying a search warrant if he can make a substantial preliminary showing that (1) the affidavit contains intentionally or recklessly false statements or misleading omissions and (2) the affidavit cannot support a finding of probable cause without the allegedly false information.  *Id*. at 155-56.  "To justify a hearing, a defendant must make specific allegations, allege a deliberate falsehood or reckless disregard for the truth, and accompany such a claim with a detailed offer of proof."  *United States v. Craighead*, 539 F.3d 1073, 1080 (9th Cir. 2008) (citation omitted).  "A hearing will not be held on a defendant's pre-trial motion to suppress merely because a defendant wants one.  Rather, the defendant must demonstrate that a 'significant, disputed factual issue' exists such that a hearing is required."  *United States v. Martin*, 2010 WL 5575323 *7 (D. Nev.) (*citing United States v. Harris*, 914 F.2d 927, 933 (7th Cir. 1990)).

Even if a defendant makes the preliminary showing, that is not enough, standing alone, to entitle a defendant to a *Franks* hearing.  A defendant must also show that the affidavit would not be sufficient to support a finding of probable cause even if it was purged of its falsities and supplemented by the omissions.  *See United States v. Stanert*, 762 F.2d 775, 782 (9th Cir. 1985) (citing *Franks*, 438 U.S. at 171-72).  "The effect of misrepresentations and omissions on the existence of probable cause is considered cumulatively."  *Stanert*, 762 F.2d at 782 (citation omitted).  Thus, the judge reviewing a request for a *Franks* hearing must determine whether the affidavit, once corrected, would provide a magistrate with the basis necessary to conclude that probable cause exists.  *Id*.

Probable cause determinations are made by viewing the "totality of the circumstances" set forth in the affidavit.  *See Illinois v. Gates*, 426 U.S. 213 (1983).  Probable cause is a fluid concept not easily reduced to a set of legal rules.  *Id*.  Consequently, the task of a magistrate judge is "simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . .

4

including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id*. at 238. A magistrate judge's determination of probable cause is accorded significant deference, *United States v. Gil*, 58 F.3d 1414, 1418 (9th Cir. 1995), and there is a "presumption of validity with respect to the affidavit supporting the search warrant." *Franks*, 438 U.S. at 171.

After careful consideration, the Court finds that Defendants have not met their burden to demonstrate that they are entitled to a *Franks* hearing. The Court will first address the alleged false statements and misleading omissions in the Norris Affidavits, then those in the Still Affidavit, and finally analyze whether probable cause exists without the alleged false information and inclusion of alleged misleading omissions.

### III.   Detailed Offer of Proof of False Statements and Misleading Omissions

The first requirement for a *Franks* evidentiary hearing is that the defendant make specific allegations that the affidavit contains intentionally or recklessly false statements or misleading omissions. *Craighead*, 239 F.3d at 1080. The Government does not dispute that Defendants have made specific allegations as to the Norris and Still Affidavits, but argues that Defendants' claims are not supported by a detailed offer of proof and the alleged statements and omissions are neither false nor misleading.

"When challenging a warrant affidavit pursuant to *Franks*, the defendant must not only specify which portions are false, but must also furnish affidavits or other reliable documentation in support of his challenge or satisfactorily explain the absence of such supporting documentation." *See United States v. Fowlie*, 24 F.3d 1059, 1066 (9th Cir. 1994) (citation omitted). The failure to do so may result in the motion being denied. *See e.g.*, *United States v. Ruddell*, 71 F.3d 331, 334 (9th Cir. 1995). In determining whether a defendant is entitled to an evidentiary hearing, "clear proof" of intentional or reckless false statements or misleading omissions is not required. *United States v. May*, 2009 WL 1542557, *9 (D. Nev.) (citing *Stanert*, 762 F.2d at 781). Such proof is reserved for the evidentiary hearing. *United States v. Gonzales, Inc.*, 412 F.3d 1102, 1111 (9th Cir. 2005). The defendant must, however, "offer direct evidence of the affiant's state of mind or inferential evidence that the affiant had obvious reasons for

omitting facts in order to prove deliberate falsehood or reckless disregard." *May*, 2009 WL 1542557 at *9 (quoting *United States v. Souffront*, 338 F.3d 809, 822-23 (7th Cir. 2003)).  Deliberate intent or reckless disregard for the truth can be inferred from the omission of material facts that would have negated probable cause, but the "omission rule . . . does not require that the affidavit provide general information about every possible theory that would controvert the affiant's good faith assertion of probable cause." *May*, 2009 WL 1542557 (quoting *Craighead*, 539 F.3d at 1081).

Intentional or reckless omissions may also provide a justification for a *Franks* hearing. *See United States v. Jawara*, 474 F.3d 565, 582 (9th Cir. 2007).  In *Jawara*, the Ninth Circuit reiterated that a defendant can "challenge a facially valid affidavit by making a substantial preliminary showing that 'the affiant intentionally or recklessly omitted facts required to prevent technically true statements in the affidavit from being misleading.'" *Id*. (citing *Stanert*, 762 F.2d at 781 ("By reporting less than the total story, an affiant can manipulate the inferences a magistrate will draw.  To allow a magistrate to be misled in such a manner could denude the probable cause requirement of all real meaning.")).  Omissions are not fatal unless they are made with the intent to deceive the court. *United States v. Nevell*, 58 F.Supp.2d 1204, 1208 (D. Or. 1999) (citations omitted).  As with false statements, a defendant must also show that the affidavit, once corrected, would not provide a substantial basis to conclude probable existed to issue the warrant. *Stanert*, 762, F.2d at 782.

Defendants identify numerous statements within the Norris and Still Affidavits that they believe are intentionally or recklessly false and omissions that they believe are deliberately misleading.  The Court will analyze each in turn to determine whether they are false or misleading and, if so, whether they are the result of a deliberate or reckless disregard for the truth. *See e.g.*, *United States v. Kyllo*, 37 F.3d 526, 529 (9th Cir. 1994); *United States v. Burnes*, 816 F.2d 1354, 1358 (9th Cir. 1987) (mere negligence is not sufficient to warrant a *Franks* hearing); *United States v. Kiser*, 716 F.2d 1268, 1274 (9th Cir. 1983) (must demonstrate false or misleading information included to deliberately or recklessly mislead the magistrate); *Franks*, 438 U.S at 171 ("Omissions or misstatements resulting from negligence or good faith mistakes will not invalidate an affidavit which on its face establishes probable cause.").

6

### A.   Norris Affidavits

On September 28, 2011, United States Magistrate Judge Leen ("Judge Leen") authorized the search of Dr. Wetselaar's home based on an affidavit sworn to by Norris.  Defs' Exhs #68, Exh. 8.  On September 29, 2011, several officers executed the search of Dr. Wetselaar's home and seized four keys that appeared to fit a safe deposit box or vault.  *Id.* at Exh. 21, WET_005090.  On October 3, 2011, Judge Leen authorized the search and seizure of three safe deposit boxes located at 24/7 Private Vaults ("24/7") based on an affidavit sworn to by Norris.  *Id.* at WET_005093.  On October 5, 2011, Judge Leen authorized the search and seizure of an additional safe deposit box based on another affidavit sworn to by Norris.  Defs' Exhs #68, Exh. 24.  The Government contends that the Affidavits establish probable cause to believe that evidence would be found in the safe deposit boxes related to the investigation of Defendants for violations of drug trafficking, money laundering, and bank secrecy laws.  In contrast, Defendants contend that there is one false statement related to income that must be excised from one of the affidavits and several misleading omissions related to the vaults that must be supplemented to the other affidavits.  Moreover, Defendants contend that the search warrants would not have been issued if all the omitted information had been included.

### 1.   $3.6 Million in Income

Defendants contend that Norris provided a far-fetched statement regarding the amount of income generated by Dr. Wetselaar that is not supported by the financial records referenced in the Affidavit.  *See* Defs' Exhs #68, Exh. 8, WET_004920.  Specifically, they contend that the statement that Dr. Wetselaar generated gross receipts of $3.6 million in twelve months is false and cite to Norris' financial analysis as proof that it is false.  In response, the Government argues that Defendants' broad challenge to how this amount was arrived at is insufficient to make a substantial preliminary showing that it is a false statement made recklessly or intentionally and that it materially affects the probable cause determination.

Defendants claim that generating approximately $3.6 million in income between August 2009 and August 2010 is "outlandish," "far-fetched," and "without basis in fact."  Defs' Mot. #65, 3, 6, and 10.  These descriptions by Defendants are insufficient to constitute a detailed offer of proof that Norris made

an intentionally or recklessly false statement.  Defendants assert the figure is unrealistic for several reasons including: the financial records Norris refers to in other sections of his Affidavit add up to almost half that amount of income, the undercover agents' physical surveillance of Dr. Wetselaar's office should have revealed an approximation of how many patients he saw on a daily basis, and his business records do not support such a figure.  Defs' Reply #90, 15..  Defendants also question how such income generation would be possible when Dr. Wetselaar was eighty-seven years old and had a substantial number of Medicare patients that could not pay high amounts.

Defendants suggestion that the Court can find this statement false "on its face" is insufficient to meet the *Franks* standard.  Defs' Mot. #65, 7.  Norris did not state that his financial analysis was intended to prove the $3.6 million figure.  Instead, Norris highlights specific financial behaviors he believed to be consistent with methods used by controlled substance diverters to conceal the nature of their illegal activity.  Also, Defendants do not provide the Court with any financial statements revealing an inconsistent gross receipts figure or the alleged business records that do not support such revenue.  Moreover, Defendants accuse the Government of misunderstanding modern medical practice, which they contend could not generate such an income.  Unsupported arguments and accusations are inadequate to meet the detailed offer of proof required for a *Franks* hearing.

Even assuming the $3.6 million figure is false, the Court finds that it does not materially affect the probable cause determination.  Norris' Affidavit provides a comprehensive analysis of Dr. Wetselaar's financial activities including: a line of credit, deposits in three bank accounts at separate domestic financial institutions, reimbursements from medical insurance companies, daily cash deposits in excess of $10,000, purchase of real estate and securities, and cash purchases of gold.  Defs' Exhs #68, Exh. 8, WET_004921-34.  Defendants do not challenge the truth of these specific financial activities.  Accordingly, the Court finds that probable cause exists based on this information about Dr. Wetselaar's financial activities even without the $3.6 million figure.  Further, Norris provided other information highlighting an increase Dr. Wetselaar's cash deposits that occurred along with an increase in the number of controlled substances prescriptions he wrote, which Norris explains as behavior consistent with

individuals structuring deposits to avoid currency transaction reporting. *Id.* at WET_004923. Therefore, a *Franks* hearing is not warranted for this alleged false statement.

### 2.     24/7 Employee's Actions in Opening and Relocating Vaults

Defendants claim that Norris omitted the information that on October 3, 2011 a search of 24/7 Private Vaults 1656, 4025, and 4010 was conducted by law enforcement and employees of 24/7 prior to Norris' application for a search warrant. Defs' Mot. #99, 17. They cite to Still's Report of Investigation as evidence that, prior to applying for the search warrant, Still and Johnson observed a 24/7 employee put the keys into the keyholes and open the doors of Vaults 1656, 4025, and 4010. Defs' Exhs #68, Exh. 26. Defendants also assert that Norris omitted the information that a 24/7 employee moved Vaults 1656, 4025, and 4010 into a floor vault until a search warrant could be obtained. Defs' Mot. #99, 18; Defs' Exhs #68, Exh. 26. In doing so, Defendants contend that Judge Leen was misled into authorizing a search of empty vaults that were not secured prior to the search warrant execution.

Defendants also assert that omission of that the 24/7 employee was acting at the direction of the Government when opening the vaults thereby destroying probable cause because a warrantless search in violation of the Fourth Amendment had already occurred. Defs' Reply #90, 11. In response, the Government contends that the 24/7 employee's verification of the vault keys does not constitute a search violative of the Fourth Amendment as she is a private citizen and did not do it at the instruction or coercion of law enforcement. Govt.'s Resp. #84, 20-24. The Government also argues that the private employee's action of moving and securing the three vaults is not material to the probable cause determination because the contents of the vaults, which included three safe deposit boxes, were not accessed prior to the execution of the search warrant. *Id.* at 24.

The Court finds that Defendants have presented sufficient evidence that Norris recklessly omitted the information regarding the actions of the 24/7 employee. Norris provided an abbreviated summary of Still and Johnson's September 29, 2011 visit to 24/7 despite knowledge of the omitted facts. *See* Defs' Exhs #68, Exh. 21, WET_005091; Govts' Resp. #84, Exhs A and C. Specifically, Norris omitted the information that Still observed the 24/7 employee place the keys into the vaults, open the vaults, and

9

notify the officers that she would move the vaults for security reasons.  The Court finds this abbreviated summary misleading given that the 24/7 employee's actions verified that the keys actually opened the vaults and relocation of the vaults may be important to the issuance of a particularized search warrant.

However, Defendants do not demonstrate how the fact that a private employee verified the keys were the correct keys to three vaults and moved them to a secured location with knowledge that the officers were seeking a search warrant materially affects the probable cause determination.  First, the Court is not convinced that relocation of the vaults is material.  The 24/7 employee justified her suggestion to relocate the vaults based on her concern that the vault owners might try to access the box in a way that would damage it.  Defs' Exhs #68, Exh. 26.  Also, it is not clear from Still's Report that the search warrant authorized a search of empty vaults.  *See* Defs' Exhs #68, Exh. 26.  The search warrant specifically refers to safe deposit box numbers 4010, 4025, and 1656.  Defs' Exhs #68, Exh. 21.  Although the 24/7 employee moved the physical location of the three vaults to a floor vault prior to the execution of the search warrant, the particularized warrant refers to the safe deposit boxes by their numbers rather than physical location.  As such, the warrant appears to contain an accurate description of the items to be searched.

Second, the Court is not convinced that an illegal search of the vaults occurred.  As the Government highlights, the contents of the safe deposit boxes located inside the vaults were not revealed prior to the execution of the search warrant.  *See* Govt.'s Resp. #84, 24.  Also, the 24/7 employee's actions in opening the vaults are not clearly established, based on Still's Report and Affidavits submitted by Norris and Still, to be coerced or performed under the authority of the officers.  *See* Defs' Exhs #68, Exh. 26; Govt's Resp. #84, Exhs A and C.  Based on this information, the Court cannot conclude that a search in violation of the Fourth Amendment occurred.

Assuming that the actions of the 24/7 employee constitute a search in violation of the Fourth Amendment, the Affidavit would then be reviewed for probable cause based only on the independent, lawful, and untainted information.  In doing so, the Court finds that probable cause exists to issue the search warrant based on facts "untainted" by the alleged prior illegality.  *United States v. Driver*, 776 F.2d

10

807, 812 (1985); *see also United States v. Giordano*, 416 U.S. 505, 554-556 (1974) (Justice Powell's concurrence in part and dissension in part) (in determining whether an illegal search invalidates a subsequent search warrant, the court considers whether the untainted portions contain a sufficient showing of probable cause); *United States v. Vasey*, 834 F.2d 782, 788 (9th Cir. 1987) ("[t]he mere inclusion of tainted evidence in an affidavit does not, by itself, taint the warrant or the evidence seized pursuant to the warrant"); *United States v. Reed*, 15 F.3d 928, 933-34 (9th Cir. 1994) (finding probable cause to issue a warrant after excising tainted information); *Franks*, 438 U.S. at 171 ("if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause," then the warrant will be deemed to have been properly issued.). Norris stated that he found a plastic bag with keys and handwritten notes with numbers on them during the execution of a search warrant. *See* Defs' Exhs #68, Exh. 21, WET_005091. He identified the keys, based on his experience, as those associated with 24/7 given his knowledge that 24/7's privacy practices are distinct from traditional practices of other companies. *Id*. Further, Still and Johnson input numbers from one of the handwritten notes to gain access to the main entrance of the lobby of 24/7, thereby verifying the accuracy of the handwritten notes. *Id.* at WET_005091-92. Then, a 24/7 employee recognized the keys as those used by 24/7 customers. *Id.* at WET_005092. Based on these earlier-acquired facts and without the further corroboration by the 24/7 employee who used the keys to open the vaults, the Court finds that there was sufficient probable cause to issue the search warrant. Consequently, Norris' omission of the information that the 24/7 employee opened and relocated the vaults does not materially affect the probable cause that exists based on the untainted portion of his Affidavit. Additionally, the Fourth Amendment governs the method of execution of a search warrant and thus, the pending Motion to Suppress (#65) is the appropriate means to address this issue.

In summary, the Court finds that Norris' omission of the 24/7 employee's actions in opening and relocating the vaults was reckless and misleading. However, neither that omission nor the alleged false statement regarding Dr. Wetselaar's income materially affect the probable cause determination for the search warrants issued based on Norris' Affidavits. As a result, a *Franks* hearing is not justified based

on these allegations.

## B.      Still Affidavit

On August 27, 2010, United States Magistrate Judge Foley ("Judge Foley") authorized the search and seizure of items from four locations based on a fifty-nine page affidavit sworn to by Still. The Government argues that the Affidavit establishes probable cause to believe that Defendants were prescribing large amounts of controlled substances in the absence of medical necessity and conspiring with others to distribute those substances via drug dealers. *See* Govt.'s Resp. #101, 4. Further, the Government contends that Defendants' request for a *Franks* hearing fails to demonstrate that any of the alleged statements or omissions were made intentionally or recklessly. *Id.* at 6. In contrast, Defendants contend that there are twelve false statements or misleading omissions that must be excised from or supplemented to Still's Affidavit.

### 1.      Comparison with Another Doctor

Defendants claim that Still acted with "reckless disregard for the truth" in comparing Dr. Wetselaar's rate of prescribing controlled substances to Dr. Mendenhall's rate. Defs' Mot. #99, 9. They argue that such comparison is misleading due to differences in their training. Defendants point to the Nevada State Board of Medical Examiners' website to show that scope of practice and licensing information differs between Dr. Mendenhall and Dr. Wetselaar, specifically, with respect to pain management. In response, the Government contends that the fact that another doctor may have provided a more appropriate comparison is not a valid basis for a *Franks* hearing.

The Court finds that Defendants have failed to establish that any statement provided by Still regarding Dr. Mendenhall is false. Significantly, Defendants do not allege that any relevant data as to Dr. Mendenhall's or Dr. Wetselaar's credentials, number of prescriptions, dosage units, or filling pharmacy is false. Instead, Defendants contend that it was misleading to omit the following information: Lam's Pharmacy completed an Owner's Diligence Report on April 28, 2010 noting that Dr. Wetselaar was receptive to abiding by anti-diversion protocol, he had a treatment protocol in place, and his particular training and expertise in treating patients with chronic and intractable pain. *See* Defs' Reply #102, 7;

12

Defs' Exhs #100, Exhs A and B.  The Court is not convinced that the omission of more information regarding Dr. Wetselaar's credentials, training, and practice was recklessly or intentionally done as Still is not required to provide his entire background.  Further, Defendants contend that Still should have known about the Lam's Pharmacy Report, but this refers to a negligence standard rather than the operative intentional or reckless standard required for a *Franks* hearing.  Additionally, Defendants do not explain how the patient record example they cite constitutes proof that Dr. Wetselaar had a protocol for treating patients and reducing pain medication.  *See* Defs' Exhs #100, Exh. B Therefore, the Court finds that this information does not demonstrate that Still was reckless or intentionally misleading as to Dr. Wetselaar's medical practice.

Moreover, Defendants have failed to establish that Still's failure to include a different comparison, with one of the doctors identified by Jason Smith, is a misleading omission.  It may have been helpful to provide a comparison with one of those doctors, but Defendants have not shown how it was done with intentional or reckless disregard for the truth.  As the Court has previously pointed out, "[a]llegations of negligence or innocent mistake are insufficient" to prove the required state of mind of the Affiant.  *Franks*, 438 U.S. at 171.  Even if the Court concedes that the comparison provided is not the best due to the difference in credentials, practice, and training, Defendants have not proven that Still supplied it recklessly.  Indeed, the Court is unable to determine that the selection of Dr. Mendenhall over other doctors and the failure to include another comparison constitutes even mere negligence.  As a result, Defendants have failed to prove why the omission of the full context of Dr. Wetselaar's practice and a different doctor comparison for rate of prescribing controlled substances warrants a *Franks* hearing.

## 2. Single Pharmacy

Defendants claim that Still omitted the information that state laws governing prescription of controlled substances provide a basis for determining what activities are outside the usual course of professional practice.  *See* Defs' Mot. #99, 10-11.  In doing, Defendants insist that Still recklessly misrepresented the significance of Dr. Wetselaar's reliance on a single pharmacy, a specific Lam's Pharmacy.  They point to a 2004 Model Policy for the Use of Controlled Substances ("Model Policy")

adopted by the Nevada State Board of Medical Examiners, which Defendants allege provides for the proposition that physicians should use one pharmacy. Defs' Exhs #100, Exh. E. Defendants also claim that Still omitted the information that Dr. Wetselaar complied with other provisions of the Model Policy, used up to 25 different pharmacies, and inherited many patients that used Lam's Pharmacy from another physician. In response, the Government asserts that if Still had cited to the Model Policy, Judge Foley would not have reached a different conclusion given that Defendants offer no evidence that they relied on or were aware of the Model Policy and many other sections of the Model Policy were violated.

The Court finds that the omission of a citation to the Model Policy does not transform Still's statement regarding Dr. Wetselaar's conduct being outside the usual course of professional conduct into a false statement. Indeed, Still refers to numerous behaviors by Dr. Wetselaar that she describes as evidence of acting outside the usual course of professional practice including: writing prescriptions for inordinately large quantities of controlled substances, allowing patients to select the controlled substances for which they receive a prescription, performing inadequate examinations or none at all prior to writing a prescription, writing prescriptions under fictitious names, and providing patients with identical prescriptions. Defs' Exhs #100, Exh. A, 14-15. Even conceding that it was misleading to omit the information that patients are encouraged to use one pharmacy under the Model Policy and excising it from Still's list of eleven behaviors, the Court finds that the other behaviors are sufficient to find probable cause and Still's statement regarding Dr. Wetselaar acting outside the usual course of professional practice is not false.

Additionally, the Model Policy states that "[t]he patient should receive prescriptions from one physician and one pharmacy whenever possible." *Id.* This is a different proposition than what Defendants contend - that a physician should only use one pharmacy. It is not clear that the Model Policy is advocating that a physician should only use one pharmacy. Practically, it seems more likely that a physician would have patients using numerous pharmacies based on several factors, including proximity to their housing or work. Moreover, Defendants have not proven that Still omitted the Model Policy with the intent to deceive the court. *See Kiser*, 716 F.2d at 1274 (must demonstrate false or misleading

14

information included to deliberately or recklessly mislead the magistrate judge).

Further, besides offering a conclusory statement that Dr. Wetselaar utilized other pharmacies, Defendants did not provide adequate proof that Still's statement that Dr. Wetselaar directed patients to fill their prescriptions at Lam's Pharmacy is false.[3]   Similarly, the Court is not persuaded that Still recklessly omitted other information - that Dr. Wetselaar inherited many patients who already used Lam's Pharmacy and Lam's Pharmacy found a drug dealer's group home compliant.   Although the Court is not sure how this information makes the single pharmacy statement false, it also notes that an affiant is not required to provide general information about every possible theory that would controvert her good faith assertion of probable cause.   *See Craighead*, 539 F.3d at 1081; *see also, United States v. Taylor*, 716 F.2d 701, 705-06 (9th Cir. 1983) (affidavit need not list potentially innocent interpretations of the facts contained within it); *United States v. Campos*, 973 F.2d 485, 490 (9th Cir. 1991) (fact that some acts might be consistent with innocence is immaterial).   More importantly, the Court finds that such information does not affect the probable cause determination.   As a result, Still's omission of information regarding the single pharmacy issue is not fatal and does not provide a basis for a *Franks* hearing.

### 3.   Cash-Pay Patients

Defendants claim that Still acted recklessly in omitting the fact that other physicians have chosen to stop accepting insurance.   *See* Defs' Mot. #99, 11-12.   They cite to information from the American Academy of Private Physicians that notes that some physicians have decided to sever relationships with insurance companies, including Medicare, because of the administrative burdens it entails.   *See* Defs' Exhs #100, Exh. G.   Also, Defendants contend that Still made a false statement because Dr. Wetselaar accepted Medicare in 2010 and several years prior.   In response, the Government contends that the mere fact that other physicians have chosen to stop accepting insurance does not defeat probable cause.

The Court is not persuaded that Still's failure to include a "trend" in physicians accepting cash-pay

---

[3] The Court notes that Defendants contend that undercover agent recordings demonstrate that Dr. Wetselaar was not resistant to the utilization of a pharmacy besides Lam's Pharmacy.   However, they cite to Defs' Exhs. #100, Exh. R, at 13, which is a page of a transcript that does not establish that Dr. Wetselaar referred that patient to a different pharmacy.

patients constitutes a material, misleading omission.  Defs' Mot. #99, 11.  Defendants' detailed offer of proof for this omission is an internet article.  The Court finds this evidence insufficient to establish that Still's omission of this fact was done intentionally or recklessly to mislead the magistrate judge.  Plus, it is immaterial to the probable cause determination that Still did not contact the Department of Health and Human Services to determine if the Office of Inspector General was investigating Dr. Wetselaar for Medicare Fraud.  *See, e.g., United States v. Miller*, 753 F.2d 1475, 1478 (9th Cir. 1985) (conjecture about what an affiant should have done is insufficient).  Moreover, Defendants provide no proof that Dr. Wetselaar accepted Medicare.[4]  It is difficult to find that Still was reckless in stating that it was her understanding that Dr. Wetselaar only accepts cash given that she was referring to her knowledge that the undercover agents were always asked for and paid with cash.  Even giving Defendants the benefit of the doubt that this is a false statement, or omitting the fact that Dr. Wetselaar accepts Medicare makes it misleading, the Court finds the probable cause determination would be unaffected as there are a sufficient number of other factors to support probable cause.

### 4.    Identical Prescriptions

Defendants claim that Still acted recklessly in omitting reference to the aforementioned Model Policy because it misled Judge Foley in his review of Still's statements regarding prescribing identical prescriptions.  *See* Defs' Mot. #99, 12.  Further, Defendants contend that Still did not provide sufficient evidence that Dr. Wetselaar issued identical prescriptions because  he gave different instructions to the undercover agents.  *See* Defs' Exhs #100, Exh. H.  In contrast, the Government contends that Defendants failed to provide any proof that the undercover agents' prescriptions were not identical.

Defendants appear to claim that the omission of the Model Policy and transcript of an undercover agent's visit establish that Still was reckless in stating that Dr. Wetselaar prescribed identical prescriptions.  Although framed as an omission of the Model Policy, the Court interprets Defendants'

---

[4] Rather than providing evidence to support their assertion that Dr. Wetselaar accepted Medicare, Defendants rely on a conclusory statement.  The Court was able to logon to www.medicare.gov to determine that Dr. Wetselaar is listed as a physician accepting Medicare.

contention as also insinuating that Still made a false statement. Regardless of whether Defendants are claiming it was a false statement or misleading omission, the Court is not persuaded that Still intentionally or recklessly acted to deceive Judge Foley as to Dr. Wetselaar's actions in prescribing identical prescriptions. Both undercover agents received an oxycodone product. Although Defendants identify a transcript in which Dr. Wetselaar gave one undercover agent advice that she could split the tablet into pieces, they do not describe whether the other undercover agent was given the same advice. Additionally, the fact that some acts might be consistent with innocence is immaterial. *See Campos*, 973 F.2d at 490. While it may be true that some patients subject to intractable pain require the same level of pain relief regardless of their physical size, Defendants have not shown this was the case for the two undercover agents. Therefore, the Court finds that Defendants have failed to carry their burden with respect to this alleged false statement or misleading omission.

### 5.       Litwin's Credentials

Defendants claim that Still acted recklessly in stating that Litwin has no medical credentials and thereby misled Judge Foley into believing that Litwin is not a legitimate medical assistant. *See* Defs' Mot. #99, 12-13. They cite to NRS 630.0129, which provides that medical assistants do not have licensing or training requirements. Defs' Exhs #100, Exh. I. In response, the Government contends that it is a true statement that Litwin has no known medical credentials and omission of the Nevada statute defining medical assistants is not misleading, intentionally or recklessly done, and does not affect probable cause.

The Court finds that omission of the Nevada statute information that a medical assistant does not need a licence is not misleading. There is no evidence that Still omitted this information recklessly to mislead Judge Foley into finding probable cause. Rather, Still referred to Litwin's lack of medical credentials in the background section to describe Litwin's role with respect to Dr. Wetselaar. Moreover, Defendants concede that this is a true statement and fail to articulate how this additional information affects the probable cause determination. The Court is unable to find that adding the information that Nevada does not require medical assistants to have a licence changes the probable cause determination related to Litwin's involvement in distributing a controlled substance. In fact, NRS 630.0129 also

17

specifies that a medical assistant does not include a person who performs "only administrative, clerical, executive, or other nonclinical tasks." *Id.* So, inclusion of the medical assistant definition from this statute would be consistent with Still's use of the term in the background section. Therefore, the Court finds that Defendants have not carried their burden of demonstrating that Still's description of Litwin as a medical assistant is a false statement and omission of NRS 630.0129 is misleading.

### 6.   Patient's Death

Defendants allege that Still recklessly omitted relevant police reports surrounding the circumstances of the death of a patient of Dr. Wetselaar's, Danny White. *See* Defs' Mot. #99, 13. In doing so, Defendants claim that Still misled Judge Foley because the Texas medical examiner's report establishes that Dr. Wetselaar's prescriptions were not the cause of death because he received other controlled substances subsequently. Defs' Exhs #100, Exh. J. Defendants also take issue with Still's statement regarding patients traveling from Ohio to see Dr. Wetselaar because it misled Judge Foley into believing that Dr. Wetselaar was an easy source of pain medication. *See* Defs' Reply #102, 11. The Government responds that Still accurately stated the information provided to her by the Nevada Board of Pharmacy regarding Danny White's death, the section Defendants highlight is a narrative provided by friends rather than the report's conclusion, and Still provided sufficient support for her statement that patients travel to Dr. Wetselaar from out of state to receive a prescription.

The Court is unable to find that Still recklessly omitted the circumstances of Danny White's death. She relied on a Nevada Board of Pharmacy complaint from the Danny White's mother to allege that some patients, including Danny White, traveled from Ohio to Nevada to see Dr. Wetselaar. The Texas medical examiner's case summary and circumstances identify his cause of death as an apparent overdose, but do not specify which drugs were the cause. As a result, the evidence submitted by Defendants does not transform Still's statement that Danny White died of an overdose of drugs prescribed by Dr. Wetselaar into a false statement. Additionally, as previously noted, an affidavit need not list potentially innocent interpretations of the facts contained within it. *See, e.g., Taylor*, 716 F.2d at 705-06. Still was not required to challenge the complaint from Danny White's mother to determine whether or not his cause

18

of death could only be attributed to Dr. Wetselaar.  Further, as the Government highlights, Still provided other supporting evidence to establish that patients traveled from Ohio to Nevada to obtain prescriptions from Dr. Wetselaar.  She cites information from a detective in Ohio who found bottles of prescription medication prescribed by Dr. Wetselaar to another patient and the undercover agent's observation that a car with Ohio license plates was parked outside of Dr. Wetselaar's office.  Defs' Exhs #100, Exh. A, 31.  So, even if the Texas medical examiner's report was added into the Affidavit, the Court finds that the probable cause determination would not be affected.

**7.**      **Prescription Monitoring Program Reports**

Defendants contend that Still recklessly omitted the fact that Dr. Wetselaar ordered Prescription Monitoring Program Reports ("PMP Reports") at the undercover agents' initial visits.  *See* Defs' Mot. #99, 13; *see also* Defs' Exhs #100, Exhs K, L, and M.  As a result, Defendants argue that Judge Foley was misled as to the quality and legitimacy of Dr. Wetselaar's treatment of these agents and his level of compliance with the Model Policy.  In contrast, the Government contends that Dr. Wetselaar's ordering of PMP Reports has no bearing on the quality of care provided during the actual patient consult and his failure to order a PMP Report after prescribing medication is more determinative of the legitimacy of his treatment.

The Court is not persuaded that Still omitted the fact that Dr. Wetselaar ordered PMP Reports recklessly.  Defendants allege that such behavior is an example of a physician acting with medical necessity and within the course of usual practice as described by the Model Policy; they argue it is an "affirmative" step by Dr. Wetselaar to learn about the prescription history of his patients.  Defs' Reply #102, 12.  However, the Court's review of the Model Policy does not confirm that PMP Reports are required, but rather, the Model Policy generally states that the physician should review the patient's course of pain treatment and keep complete records as to medications prescribed.  Defs' Exhs #100, Exh. E.  More importantly, it is unclear how a single check of a patient's prescription history performed before Dr. Wetselaar prescribed medication destroys the probable cause finding related to Dr. Wetselaar's behavior after reading the reports.  In fact, Defendants concede that the PMP Reports for both undercover agents

19

show that they received pain prescriptions from another physician. *See* Defs' Mot. #99, 14. Dr. Wetselaar's behavior in prescribing them medication subsequent to learning this information is therefore inconsistent with Defendants' previous contention that they follow the Model Policy's suggestion of one physician. Thus, the Court does not find the omission of PMP Reports was made recklessly by Still or is material to the probable cause determination.

### 8.    Cappers' Payment

Defendants argue that Still recklessly omitted the information that C.A. and M. S. (collectively, "the Cappers") were drug dealers who paid patients to see Dr. Wetselaar. *See* Defs' Mot. #99, 14. They rely on an undercover operation transcript in which the Cappers explain that they refer clients to Dr. Wetselaar, collect the prescriptions he issues, and sell the pills on the street. Defs' Exhs #100, Exh. N. In response, the Government contends that this information was included in the Affidavit because Still states that the Cappers "were responsible . . . for bringing large numbers of patients to Wetselaar's office . . . and paying 'patients' for their 'services.'" Defs' Exhs #100, Exh. A, 6-7.

The Court agrees with the Government that this information was stated by Still on page six and thirty-seven of her Affidavit. *Id.* Indeed, Still disclosed the Cappers scheme in at least three places in her Affidavit. *Id.* at 6-7, 38, and 43. Although Defendants suggest that the undercover recordings prove that they were not intentionally conspiring with the Cappers, and Judge Foley should not have been led to believe that proposition, the Court finds that they failed to carry their burden of establishing that Still made a false statement to that effect. Accordingly, Defendants' allegation with respect to the Cappers does not warrant a *Franks* hearing.

### 9.    Defendants' Report of Forged Prescription

Defendants allege that Still recklessly omitted the information that Dr. Wetselaar reported a forged prescription. *See* Defs' Mot. #99, 14. They cite to a Las Vegas Metropolitan Police Department Physician Affidavit filed by Dr. Wetselaar on February 23, 2010, which reports that a patient forged Dr. Wetselaar's signature for an oxycodone prescription dated February 6, 2010. Defs' Exhs #100, Exh. O. In response, the Government contends that this single instance of identifying a forged prescription does not outweigh

20

the probable cause determination based on approximately 13,600 prescriptions written between July 2008 and July 2010.  Defs' Exhs #100, Exh. A, 17-20.  Additionally, the Government highlights the fact that the prescription was brought to a different pharmacy than Lam's Pharmacy, which is identified in the Affidavit as being part of the conspiracy at issue in this action.

    The Court finds that Defendants failed to establish that Still recklessly omitted this information. As previously noted, the "omission rule . . . does not require that the affidavit provide general information about every possible theory that would controvert the affiant's good faith assertion of probable cause." *May*, 2009 WL 1542557 (quoting *Craighead*, 539 F.3d at 1081).  It is unclear how Still was reckless in not reporting this single instance of Dr. Wetselaar abiding by the law.  Defendants have also not established that she knew of this information when preparing the Affidavit.[5]  Moreover, the fact that Dr. Wetselaar reported a forged prescription one time is not material to the probable cause determination that is based upon his behavior over several years.  Indeed, Still supports her assertion that Dr. Wetselaar was not prescribing controlled substances for a legitimate medical purpose and was acting outside the usual course of his professional practice based on a thorough description of his habits over a couple of years with respect to dosage units, total number of prescriptions written, and types of medications.  *See* Defs' Exhs #100, Exh. A, 17-20.  Therefore, this allegation does not justify a *Franks* hearing.

### 10.    Undercover Agent Urinalysis

    Defendants contend that Still recklessly omitted the information that Dr. Wetselaar ordered a urinalysis on the final visit of one of the undercover agents.  *See* Defs' Mot. #99, 15.  They provide a medical record for this agent that specifies that a urine test is required.  Defs' Exhs #100, Exh. P. Defendants argue that this is evidence that Dr. Wetselaar was complying with the Model Policy's suggestion of using urinalysis as a tool to ensure that a patient is not diverting drugs.  They also suggest

---

[5] The Government alleges that the Physician Affidavit is not a document produced by it during discovery and therefore, this allegation is untimely because Defendants knew of it prior to the dispositive motion deadline.  As the Court previously noted, it is aware of the timeliness objection and agrees that Defendants did not properly file their request for a *Franks* hearing, but it will consider this allegation in an effort to decide the merits of the dispute.

21

that this test, in combination with Dr. Wetselaar's ordering of a PMP Report for the undercover agent, is evidence that Dr. Wetselaar assessed his patients for the misuse of prescriptions and doctor shopping. In contrast, the Government underscores that the urinalysis test was ordered on the last of the undercover agent's five monthly visits to Dr. Wetselaar and such a test was never ordered for the other undercover agent. They also allege that Dr. Wetselaar ordered such test at the request of Lam's Pharmacy rather than on his own initiative.

The Court finds that the omission of the fact that Dr. Wetselaar ordered an urinalysis test for one of the undercover agents is not misleading. Defendants conclusorily state that the omission deprived Judge Foley of a making a fair determination of probable cause. *See* Defs' Mot. #99, 15. However, the Court is not convinced that Still excluded this one test recklessly to mislead Judge Foley into finding probable cause. The fact that this single act might be consistent with innocence is immaterial given Defendants' failure to prove its omission was reckless or intentional. *See Campos*, 973 F.2d at 490. As a result, this is not a fatal omission.

## 11.   Refusal to Prescribe Medication

Defendants allege that Still recklessly omitted evidence that Dr. Wetselaar refused to prescribe Adderall, testosterone cream, and oxycodone to one of the undercover agents. *See* Defs' Mot. #99, 15. They cite to transcripts of the undercover agents' visits as evidence that Dr. Wetselaar refused to prescribe unnecessary medication or backdate a prescription. Defs' Exhs #100, Exhs N, R, S; *see also* Defs' Reply #102, 14. In response, the Government highlights a section in Still's Affidavit acknowledging that Dr. Wetselaar refused to provide a prescription for testosterone cream, percocet, and oxycodone and instead prescribed Xanax and Viagra. *See* Defs' Exhs #100, Exh. A, 28.

The Court finds that rather than being omitted, Still specially includes information regarding Dr. Wetselaar's refusal to prescribe a testosterone cream and oxycodone to an undercover agent. *See id.* So, the only omission Defendants accurately point out is the refusal to prescribe Adderall. The Court does not find this fact was omitted recklessly given that Dr. Wetselaar refused to prescribe it because he does not believe attention deficit disorder, which Adderall is typically prescribed for, is a real disease that

warrants medication.  *See* Defs' Exhs #100, Exh. N, DEA_001461.  For example, Dr. Wetselaar states, "I'm from Europe, okay?  And many, many years ago I. . . got my medical degree there, and . . . nobody ever used the word ADD . . . This is all phony, liberal, make-up in my opinion."  *Id.*  Additionally, although Defendants claim that Judge Foley should have been provided with an accurate summary of the undercover agents' visits, they do not highlight any other inaccuracies in Still's summary of their visits.  Defendants contention that Judge Foley should have been informed of this information falls short of the reckless or intentional standard required for a *Franks* hearing.

### 12.    Legitimacy of Initial Patient Visits

Defendants argue that Still recklessly omitted evidence that Dr. Wetselaar conducted legitimate physical examinations on the undercover agents.  *See* Defs' Mot. #99, 15.  They cite to transcripts of the undercover agents' visits and consent agreements as evidence that Dr. Wetselaar performed physical examinations consistent with legitimate medical practice.  Defs' Exhs #100, Exhs N, T, U, and V.  In response, the Government contends that the full transcripts of the undercover agents' visits with Dr. Wetselaar were not omitted recklessly or intentionally because Still's summary of their encounters is accurate.

The Court agrees that this conclusory allegation of omitted information is not supported by the type of detailed proof required to receive a *Franks* hearing.  Defendants fail to cite to any facts in the transcripts that they claim are "important" to establish that Dr. Wetselaar performed a "physical examination . . . consistent with legitimate medical practice."  Defs' Reply #102, 15.  The Court is left without any evidence to determine why Still's statement that Dr. Wetselaar performed inadequate examinations is false or what facts the transcripts provide to establish that he acted consistently with legitimate medical practice.  Moreover, the Court is unable to find the omission of the complete transcripts to be misleading when Defendants do not specify the factual circumstances in those office visits that would be material to the probable cause determination.  As a result, this alleged omission does not warrant a *Franks* hearing.

In conclusion, the Court finds that Defendants have failed to carry their burden of demonstrating

that eleven of the twelve alleged false statements and material omissions in the Still Affidavit were intentionally or recklessly made. Defendants' twelve allegations are mostly conclusory arguments provided without a sufficiently "detailed offer of proof." *Franks*, 438 U.S. at 171. The Court notes that conjecture about what an affiant should have known or done is insufficient to receive a *Franks* hearing. *See, e.g., Miller*, 753 F.2d at 1478. Furthermore, the fact that some acts might be consistent with innocence is immaterial. *Campos*, 973 F.2d at 490; *United States v. Hoyos*, 892 F.2d 1392-93 (9th Cir. 1989) (overruled on other grounds by *United States v. Ruiz*, 257 F.3d 1030 (9th Cir. 2001)). As previously noted, the "omission rule . . . does not require that the affidavit provide general information about every possible theory that would controvert the affiant's good faith assertion of probable cause." *May*, 2009 WL 1542557 (quoting *Craighead*, 539 F.3d at 1081). Consequently, of the twelve allegations, the Court finds only one misleading omission - the fact that Dr. Wetselaar accepted Medicare in addition to cash payments. Nevertheless, the Court concludes that this omission does not negate the probable cause finding supported by other evidence in Still's fifty-nine page Affidavit.

## IV.   Probable Cause

Ultimately, Defendants did not meet their burden of making a substantial preliminary showing that the Norris and Still Affidavits contain intentionally or recklessly false statements or misleading omissions with the exception of two omissions - the actions of the 24/7 employee and Dr. Wetselaar's acceptance of Medicare. Nevertheless, even when the alleged false statements are excised from the affidavits and alleged misleading omissions are added to the affidavits, the Court finds that there is probable cause to issue the search warrants.

Norris provided a substantial analysis of Dr. Wetselaar's financial activities. He cited transactions that led him to believe that Dr. Wetselaar structured deposits to avoid currency transaction reports at least twenty times. *See* Defs' Exhs #96, Exh. 8, WET_004924 and 27. He also provided evidence of an increase of cash deposits that correlated with an increase in controlled substances prescriptions. *Id.* at WET_4924. Additionally, Norris identified Dr. Wetselaar as accessing his safe deposit box on the same days that he made cash withdrawals. *Id.* at WET_004935. Further, Norris confirmed that the keys he

found in a search of Dr. Wetselaar's residence corresponded to four safe deposit boxes at 24/7 Private Vaults. This evidence, even without the $3.6 million figure and actions of the 24/7 employee, is sufficient to find probable cause to issue the search warrants.

Similarly, Still provided evidence of reports received from other law enforcement personnel, information from undercover agents, pharmacy records, and video surveillance summaries to support her application for a search warrant. The Court finds that this evidence, even without the information related to the twelve issues identified above, supports probable cause to believe that a search was warranted to find evidence related to whether or not the Defendants were involved in illegal drug distribution. For example, the PMP Reports of Dr. Wetselaar's prescription history show that a significant number of controlled substances were prescribed. *See* Defs' Exhs. #100, Exh. A, 17-20. Also, a Department of Labor Agent supplied Still with information that a pharmacist was given a kickback offer for not questioning Dr. Wetselaar's prescriptions. *See* Defs' Exhs. #100, Exh. A, 21-23. Additionally, a Federal Bureau of Investigation Agent informed Still that a FBI Target provided a team of eighty people with false personal identifying information to obtain prescriptions from Dr. Wetselaar. *See* Defs' Exhs. #100, Exh. A, 29-30. Moreover, the Court reviewed the copy of Still's Affidavit provided by Defendants with portions they request excised. *See* Defs' Exhs #100, Exh. W. After doing so, the Court was still able to find that probable cause exists to issue the search warrant. Therefore, when viewed cumulatively, and with the deference afforded a magistrate's determination of probable cause, the undersigned concludes that Defendants are not entitled to a *Franks* hearing.

## CONCLUSION

In conclusion, Defendants have attempted to meet their burden of demonstrating that they are entitled to a *Franks* evidentiary hearing regarding the Norris and Still Affidavits with an Omnibus Discovery Motion, an oral proffer, and two subsequent motions for a *Franks* hearing. Despite these numerous opportunities, Defendants failed to support their allegations with a detailed offer of proof. Indeed, Defendants consistently confused the legal standard for requesting a *Franks* hearing by failing to specify the alleged false statement or misleading omission, provide detailed proof that the alleged

1   statement or omission was done intentionally or recklessly, and explain why it is material to the

2   probable cause determination.  Moreover, the Court finds that the alleged statements and omissions

3   are neither false nor misleading with the exception of the omission of information related to the 24/7

4   employee's opening and relocating the vaults and Dr. Wetselaar's acceptance of Medicare.  Even

5   leniently crediting some of Defendants' arguments, the Court still finds that the Judge Leen and Judge

6   Foley had a substantial basis for concluding that probable cause existed to issue the search warrants.

7   Accordingly, the Court finds that Defendants are not entitled to a *Franks* hearing.

8         Based on the foregoing and good cause appearing therefore,

9   **RECOMMENDATION**

10         **IT IS THE RECOMMENDATION** of the undersigned Magistrate Judge that Defendant

11   Henri Wetselaar, M.D., and Defendant David Litwin's request for a *Franks* Hearing contained within

12   their Omnibus Motion (#65), Motion for *Franks* Hearing (#95) and Re-Filed Motion for *Franks*

13   Hearing (#99) be **denied**.

14   **NOTICE**

15         Pursuant to Local Rule IB 3-2 any objection to this Report and Recommendation must be in

16   writing and filed with the Clerk of the Court within 14 days. The Supreme Court has held that the

17   courts of appeal may determine that an appeal has been waived due to the failure to file objections

18   within the specified time. *Thomas v. Arn*, 474 U.S. 140, 142 (1985).  This circuit has also held that

19   (1) failure to file objections within the specified time and (2) failure to properly address and brief the

20   objectionable issues waives the right to appeal the District Court's order and/or appeal factual issues

21   from the order of the District Court. *Martinez v. Ylst*, 951 F.2d 1153, 1157 (9th Cir. 1991); *Britt v.*

22   *Simi Valley United Sch. Dist.*, 708 F.2d 452, 454 (9th Cir. 1983).

23         DATED this 9th day of August, 2013.

 

                    _____

                    **C. W. Hoffman, Jr.**
                    **United States Magistrate Judge**

26