UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA
* * *

UNITED STATES OF AMERICA,    )
                             )
            Plaintiff,       )        Case No. 2:11-cr-00347-KJD-CWH
                             )
vs.                          )        **FINDINGS AND RECOMMENDATION**
                             )
HENRI WETSELAAR, M.D., *et al.*,    )
                             )
            Defendants.      )
_____ )

This matter is before the Court on Defendant Henri Wetselaar, M.D., ("Wetselaar") and
Defendant David Litwin's ("Litwin") (collectively "Defendants") Omnibus Motion (#65), filed on
March 27, 2013.  The Court also considered the Declaration of Jeffrey Setness in Support of the
Omnibus Motion (#67) and Exhibits (#68), both filed on March 27, 2013, the Government's Response
(#84), filed on April 19, 2013, and Defendants' Reply (#90), filed on May 10, 2013.  In addition, the
Court considered the Government's Supplemental Memorandum (#120), filed on October 3, 2013,
Defendants' Supplemental Brief (#122), filed on October 15, 2013.  The Court also considered
Litwin's Financial Affidavit (#125) and the Declaration of Stacy Bowers (#126), both filed on October
17, 2013, Defendants' Brief (#127) and Exhibits (#128-#129), all filed on October 31, 2013, and the
Government's Supplemental Memorandum (#130), filed on October 31, 2013.  Finally, the Court
conducted evidentiary hearings on June 3, 2013, September 19, 2013, and October 17, 2013.

The Court previously provided a Report and Recommendation on August 9, 2013 regarding
the portion of Defendants' Omnibus Motion requesting a *Franks* Hearing.  *See* Report and
Recommendation #109.  Defendants objected to the Report and Recommendation on August 23, 2013.
*See* Objection #112.  On September 25, 2013, Judge Dawson adopted and affirmed the Report and
Recommendation, which denied the *Franks* hearing.  *See* Order #118.  This Report and

Recommendation will address the remainder of the Omnibus Motion (#65) requesting suppression of evidence and return of seized property.

## BACKGROUND

Wetselaar is a practicing physician in Las Vegas, Nevada who operates a medical practice, known as New Amsterdam Medical Group ("NAMG"). Litwin has been employed by Wetselaar at the NAMG since September 1, 2008. The Government alleges that the patients of Wetselaar and Litwin were provided with unnecessary prescriptions for pain killers, muscle relaxants, or anti-anxiety medications. The Government further alleges that the patients were directed to fill their prescriptions at a pharmacy managed by co-defendant Smith in order to ensure that the prescriptions were filled without question. Additionally, the Government contends that the cash proceeds of these transactions were handled in violation of various federal banking laws.

On September 21, 2011, Defendants Wetselaar and Litwin along with Jason C. Smith ("Smith) were charged with a twenty-three count indictment including: one count of Conspiracy to Distribute Oxycodone in violation of Title 21, United States Code, Sections 846, 841(a)(1) and (b)(1)(c) [Wetselaar, Litwin, and Smith]; eight counts of Distribution of Controlled Substances, in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(c), Title 18, United States Code, Section 2; and Title 21, Code of Federal Regulations, Section 1306.04 [Wetselaar and Litwin]; three counts of Making a False Statement to a Government Agency, in violation of Title 18, United States Code, Section 1001 [Litwin]; one count of Money Laundering in a Value Greater than $10,000, in violation of Title 18, United States Code, Sections 1957 and 2 [Wetselaar]; and 10 counts of Structuring Transactions to Evade Reporting Requirements in violation of Title 31, United States Code, Sections 5324(a)(3) and (d)(1), Title 31, Code of Federal Regulations, Section 103.11, and Title 18, United States Code, Section 2 [Wetselaar]. Additionally, the indictment also includes nine criminal and civil forfeiture allegations pursuant to Title 18, United States Code, Section 981(a)(1)(A), 982(a)(1) and 1957; Title 21, United States Code, Sections 846, 841(a)(1), 853(a)(1)-(2) and (p), 881(a)(6); Title 28 United States Code, Section 2461(c); and Title 31 United States Code, Sections 5317(c)(1); 5324(a)(3)

and (b)(1) [Wetselaar, Litwin, and Smith].

## DISCUSSION

On March 27, 2013, Defendants Wetselaar and Litwin filed an Omnibus Motion (#65) requesting three forms of relief: (1) suppression of the results of searches and seizures that occurred between August 31, 2010 and October 5, 2011, (2) return of seized property and assets under Federal Rule of Criminal Procedure Rule 41(g), and (3) return of seized property and assets to pay legal fees. Each request for relief will be addressed in turn.

With respect to the first request, Defendants move to suppress the results of ten searches and seizures. The ten searches were conducted pursuant to search warrants issued by magistrate judges including:

> (1) August 31, 2010 Search of 4525 S. Sandhill Road (Wetselaar's medical office) - Case No. 2:10-mj-608-GWF;
> (2) September 29, 2011 Search of 3681 Forest Crest Drive (Wetselaar's residence) - Case No. 2:11-mj-0639-PAL;
> (3) September 29, 2011 Search of Nevada State Bank Safe Deposit Box – (Wetselaar's safe deposit box) - Case No. 2:11-mj-0640-PAL;
> (4) October 3, 2011 Seizure of Edward D. Jones Trading Account (Wetselaar's account) - Case No. 2:11-mj-0643-PAL;
> (5) October 3, 2011 Seizure of Nevada State Bank Account (Wetselaar's account) - Case No. 2:11-mj-0644-PAL;
> (6) October 3, 2011 Seizure of Wells Fargo Bank Account (Wetselaar's account) - Case No. 2:11-mj-0645-PAL;
> (7) October 3, 2011 Seizure of JP Morgan Chase Bank Business Account – (Wetselaar's account) - Case No. 2:11-mj-0646-PAL;
> (8) October 3, 2011 Seizure of Nevada State Bank Safe Deposit Box (Wetselaar's safe deposit box) - Case No. 2:11-mj-0647-PAL;
> (9) October 3, 2011 Search of 24/7 Private Vaults (Vault Nos. 4025 and 1656 are Wetselaar's and Vault No. 4010 is Litwin's) - Case No. 2:11-mj-0648-PAL; and
> (10) October 5, 2011 Search of 24/7 Private Vaults (Vault No. 1023 is Litwin's) - Case No. 2:11-mj-0658-PAL.

For searches and seizures (2) through (8), Defendants' only argument for suppression of the evidence is based on a *Franks v. Delaware*, 438 U.S. 154 (1978), challenge to the sufficiency of the search warrant affidavits. Defendants contend that warrants (2) through (8) are insufficient because the supporting affidavits contain misleading omissions and false statements. The Court previously denied this request for a *Franks* hearing and found the warrants were supported by sufficient probable cause. *See* Order #118. Accordingly, the Court will not address this argument again and will

3

recommend that Defendants' request to suppress evidence resulting from searches and seizures (2) through (8) be denied.

## I.  Motion to Suppress Results of Searches and Seizures (1), (9), and (10)

Defendants allege that search and seizure (1), the August 31, 2010 search of Wetselaar's medical office, illegally exceeded the scope authorized in the search warrant.  As a result, Defendants request suppression of any and all property, papers, documents, letters, notebooks, records, files, folders, computerized information, other evidence, and statements and testimony derivative of this search and seizure.  In addition, Defendants argue that search and seizure (9), the October 3, 2011 Search of 24/7 Private Vaults (two vaults of Wetselaar and one vault of Litwin), and search and seizure (10), the October 5, 2011 Search of 24/7 Private Vaults (one vault of Litwin), were preceded by an illegal search by government agents and a 24/7 employee.  Accordingly, Defendants again request suppression of all evidence seized and derivative of these searches.  The Court will first address Defendants arguments regarding search and seizure (1) and then turn to search and seizure (9) and (10).

### A.  Search and Seizure (1): Medical Office

#### 1.  Execution of the Warrant

On August 27, 2010, Task Force Officer Kendra Still ("TFO Still") applied for and obtained a search warrant to search the NAMG located at 4525 Sandhill Road in Las Vegas.  *See* Oct. 17, 2013 Hearing, Exh. A-1.  NAMG is owned by Wetselaar and he is the sole physician in that office.  The pertinent portion of the search warrant authorized the seizure of "patient files and/or medical records maintained by Wetselaar, Litwin or New Amsterdam Medical Group, or their employees, for patients who received prescriptions for controlled substances."  *Id.*

The search occurred on August 31, 2010 and took about four hours.  Around 8 a.m., thirteen officers of the Drug Enforcement Administration ("DEA") and the Las Vegas Metropolitan Police Department ("LVMPD") involved in the execution of the search arrived at NAMG.  Eight officers were assigned to conduct the search, three were assigned to security, and two were assigned to

4

interview Defendants.  Upon Wetselaar's arrival shortly after 8 a.m., the officers advised him of the warrant and accompanied him into NAMG.

TFO Still was generally familiar with the layout of the office because she had previously visited the building and walked through the offices.  She testified that medical records were located in all three suites of NAMG including: Suite 102 used for patient treatment, Suite 105 used as a waiting room, and Suite 107 divided into a reception area, a room for the receptionist, and a personal office which contained a desk, couch and filing cabinets.  Additionally, DEA Agent Kallal ("Agent Kallal") was the supervising agent for the execution of the search warrant.  He testified that there were voluminous patient files located in all three suites and the files did not appear to be organized in any particular fashion including by alphabetical order or type of payment.  Further, Agent Kallal testified that he reviewed some of the records looking for the criteria in the search warrant and to determine how they were organized.  Also, prior to the commencement of the search, agents asked Wetselaar and Litwin to identify the types of files contained in each of the suites.  When advised that the search warrant authorized the officers to take all files for patients who received controlled substance prescriptions, Wetselaar told the agents, including TFO Still, "then you are going to be taking all of them."[1]  TFO Still testified that she believed that it would have taken 10 to 12 hours to complete the search if each patient file had been reviewed individually.  As the result of the discovery of a large number of disorganized files, the limited number of agents available to review the documents, and Defendants unwillingness to assist the officers in identifying the organization of the files, Agent Kallal decided to seize all of the patient files at NAMG.

TFO Still testified that after the execution of the warrant, she immediately began a review of the records in her office.  She estimated that about 500 to 600 files were seized, the size of the files

---

[1] This testimony conflicts with Defendants' representation in their Motion (#65) that they "told the agents in substance that: (1) the files in Suite 107 would be patients with insurance including Medicare and Medicaid; (2) the files in Suite 102 were for pain management patients; (3) the files in Suite 105 were for inactive or deceased."  Defs' Omnibus Mot. #65, 9.  Given that Defendants did not testify and the TFO Still and Agent Kallal described Defendants as uncooperative, the Court finds the officers' recollection to be credible.

1   ranged from a few pages to "voluminous," and after review, 96% contained controlled substance

2   prescriptions.  Agent Kallal testified that the evidence filled two SUVs and consisted of maybe 1,000

3   records.  TFO Still later provided the files to a person retained by law enforcement as a medical

4   resource for the investigation and 238 files were analyzed and retained as evidence.

5           Shortly after the execution of the search warrant, a Special Agent with the Department of

6   Health and Human Services, Office of Inspector General (HHS-OIG) asked TFO Still if she could

7   review seized Medicaid and Medicare patient files for evidence of billing fraud.[2]  This was the first

8   time that TFO Still became aware that HHS-OIG had an interest in Wetselaar.  TFO Still testified that

9   HHS-OIG played no role in the preparation or execution of the search warrant and she has no

10  knowledge that fraud occurred.  After consultation with her superiors, TFO Still provided several

11  boxes of medical files for HHS-OIG's review.  TFO Still further testified that the search warrant does

12  not speak to the question of whether records could be shared with other law enforcement entities.

13                  **2.**      **Defendants' Standing**

14          It is axiomatic that an individual seeking to exclude evidence allegedly obtained in violation of

15  the Fourth Amendment must have standing to challenge the illegal conduct that led to the discovery of

16  the evidence.  *United States v. Pulliam*, 405 F.3d 782, 785-786 (9th Cir. 2005) (citing *Rakas v.*

17  *Illinois*, 439 U.S. 128, 134 (1978)) (finding defendant did not have standing to challenge the search of

18  a car in which he was a passenger and seizure of the gun found in the car did not violate his Fourth

19  Amendment rights).  "To invoke the protections of the Fourth Amendment, a person must show he

20  had a 'legitimate expectation of privacy.'"  *United States v. Nerber*, 222 F.3d 597, 599 (9th Cir. 2000).

21  To establish a legitimate expectation of privacy a person must show (1) a subjective expectation of

22  privacy (2) that society is prepared to recognize as objectively reasonable.  *Id.* (quoting *Smith v.*

23  *Maryland*, 442 U.S. 735 (1979)).  "A person who is aggrieved by an illegal search and seizure only

24

25

26          [2] One of the three agents who provided security outside of the medical office during the search is

27  married to the Special Agent of the HHS-OIG who contacted TFO Still.  Wetselaar made no argument regarding the relevance of that relationship and the Court finds that it does not impact the issues before

28  the Court.

6

through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed." *Rakas*, 439 U.S. at 134. Accordingly, the burden of establishing that the Fourth Amendment was violated by a search or seizure rests with the proponent of a motion to suppress. *United States v. Caymen*, 404 F.3d 1196, 1199 (9th Cir. 2005) (citation omitted) (finding defendant failed to show he had reasonable expectation of privacy in laptop seized by police).

Litwin does not contend that he has standing to challenge the search and seizure of the medical office. *See* Defs' Reply #90, 3-4. On the other hand, Wetselaar argues that he has standing to challenge the search and seizure of the medical office because he is the owner and sole practitioner of NAMG. The Government argues that Wetselaar has failed to provide sufficient facts to support a reasonable expectation of privacy, subjective or objective, in the medical office. Specifically, the Government contends that Wetselaar's status as an owner of the premises is not enough to establish standing to challenge the search. The Government primarily relies on the Ninth Circuit's finding in *United States v. SDI Future Health, Inc.*, 568 F.3d 684, 698 (9th Cir. 2009), that simple ownership, management, or employment are too broad and generalized to satisfy the requirement that a defendant establish standing.

To establish standing, Wetselaar presented evidence of a one year rental agreement between NAMG and lessor Sandhill Business Center for Suite 107 from November 1, 2008. *See* Oct. 17, 2013 Hearing, Exh. P-1. It is signed by Wetselaar and corroborated by a Declaration from Carlos V. Escapa, manager of Sandhill Business Center, LLC, indicating that Wetselaar is the lessee and person who paid the rent for the premises from November 2008 to the present. *See* Oct. 17, 2013 Hearing, Exh. P. Since approximately September 2010 to the present, Suite 102 has also been leased to NAMG, but no written agreement was produced. *See id.* Suite 105 was leased to NAMG as well, but no written agreement was produced. *See id.* After the expiration of the written leases, the entire property has been rented to NAMG on a month to month basis. *See id.* Monthly payments in the form of checks to the lessor have been made by Wetselaar, doing business as NAMG.

Moreover, according to the affidavit submitted by TFO Still to support the search of NAMG, Wetselaar is owner of the NAMG and has obtained a business license for this medical practice. *See* Oct. 17, 2013 Hearing, Exh. A-2. Additionally, he is the sole practitioner at NAMG and conducts his practice there on a regular basis. Given that he is the only doctor practicing at the medical group, Wetselaar has full access to the medical office and manages its daily activities. This level of ownership, management, and control over NAMG provides sufficient standing for Wetselaar to contest the search of NAMG. Moreover, the medical files are presumed to be business records created and maintained at Wetselaar's direction as they constitute documentation required to be maintained by a physician regarding a particular person's medical history. Further, the medical files contain decisions and explanation for those decisions that Wetselaar made including signing prescriptions. It is for this reason that the Government obtained the search warrant to seize the medical records in its investigation of Defendants for unlawful prescription of controlled substances.

In *United States v. Gonzalez, Inc.*, 412 F.3d 1102, 1117 (9th Cir. 2005) (amended on other grounds by *United States v. Gonzalez, Inc.*, 437 F.3d 854 (9th Cir. 2006)), the Ninth Circuit held that the directors of a small, family-run corporation had standing to challenge a wiretap in one of the company's buildings because they had a reasonable expectation of privacy in calls made from, to, and within the premises. The Ninth Circuit relied on the fact that the defendants were corporate officers who had ownership of the premises, exercised full access to the building and managerial control over its day-to-day operations, and had a reasonable expectation of privacy over calls made on the premises. Here, as in *Gonzalez*, the Court finds that Wetselaar has standing because he is not only the sole owner, but also the only physician in the practice, manages and controls the entire business, and has access to the entire medical office. Additionally, the medical records at issue are business documents that memorialize his medical decisions. Accordingly, the Court finds that Wetselaar has standing to challenge the medical office search and the medical records seizure.[3]

_____

[3] Litwin does not assert that he has standing in the search of NAMG or medical records so the Court will only address Wetselaar's Fourth Amendment challenge to search and seizure (1).

### 3.   Fourth Amendment Analysis

Wetselaar argues that the officers did not confine their search of NAMG, in good faith, to the objects identified in the warrant. Rather, Wetselaar contends that the officers substantially exceeded any reasonable interpretation of the provisions of the search warrant and conducted an illegal general search. Wetselaar also alleges that the agents seized all medical records instead of those including prescriptions for controlled substances as described by the warrant. As a result, Wetselaar requests that all medical records, including those described by the warrant, be suppressed.[4]  In response, the Government contends that the execution of the warrant was reasonable under the circumstances. Further, the Government claims that the search and seizure was not so egregious as to constitute a "flagrant disregard" for the terms of the warrant and therefore, the extraordinary remedy of blanket suppression of all of the evidence seized is not warranted.

Generally, the Fourth Amendment is violated by a governmental seizure of items beyond the terms of the warrant. *See United States v. Tamura*, 694 F.2d 591, 595 (9th Cir. 1982) ("As a general rule, in searches made pursuant to warrants only the specifically enumerated items may be seized."). Ordinarily, when officers seize items beyond the scope of a search warrant, only the evidence obtained

---

[4] Wetselaar also argues that the sharing of medical records with HHS-OIG "amounts to trespass, as described in *United States v. Jones*, 132 S.Ct. 945 (2012), or common law conversion. However, Wetselaar failed to provide any analysis or points and authorities to explain how *Jones* applies or to support the conversion theory. *See* LCR 47-9 (failure to file points and authorities constitutes consent to denial of motion). Similarly, Wetselaar failed to cite any authority for the proposition that the sharing of lawfully seized evidence among federal law enforcement entities constitutes a violation of the Fourth Amendment and the Court is not aware of such authority.

Wetselaar further contends that the sharing of the medical records with HHS-OIG constitutes a violation of the patients' rights to privacy under 42 U.S.C. 1320d-1320d-8 (HIPAA) and that HIPAA requires a covered entity to have authorization to use or disclose protected medical information. Even assuming the DEA is a "covered entity" in these circumstances, Defendants provide no analysis or points and authorities that sharing medical records with a law enforcement agency that investigates Medicare/Medicaid fraud violates HIPAA or the Fourth Amendment. *See* LCR 47-9. Further, the search warrant allowed for the disclosure of files containing personally identifiable health information to individuals involved in the criminal investigation and prosecution of NAMG. *See* October 17, 2013 Hearing, Exhibit A-1, Attachment B1(k). Therefore, the Court finds that these three additional arguments do not support the suppression relief requested and warrant no further consideration.

in violation of the warrant is suppressed. *Id.* at 597. Notably, Wetselaar has not identified any particular medical record that was seized, which did not contain an annotation of a prescription for controlled substances. Accordingly, the Court finds no basis to suppress any specific medical records on the theory that they are outside the scope of the NAMG search warrant.

In cases where there is a "flagrant disregard" for the terms of the warrant, the court may suppress all of the evidence, including untainted evidence. *United States v. Juichang Chen*, 979 F.2d 714, 717 (9th Cir. 1992). However, the Ninth Circuit has found that this extraordinary remedy should be used only when the violation of the warrant is so extreme that the search is essentially transformed into an impermissible general search. *Id.*; *see also United States v. Crozier*, 777 F.2d 1376, 1381 (9th Cir. 1985) (finding violation of the warrant's terms was not flagrant and only items falling outside the scope of the warrant should be suppressed); *United States v. Offices Known as 50 State Distrib. Co.*, 708 F.2d 1371, 1376 (9th Cir. 1983) (finding overbreadth did not rise to level of general warrant and selective suppression or return of items improperly seized was appropriate). In fact, the Ninth Circuit has refused to suppress all evidence seized when agents exceeded their authority under the warrant because they "were motivated by considerations of practicality rather than by a desire to engage in indiscriminate 'fishing.'" *Tamura*, 694 F.2d at 597; *compare United States v. Rettig*, 589 F.2d 418, 423 (9th Cir. 1978) (all evidence suppressed where warrant served as pretext to look for other items), with *United States v. Heldt*, 668 F.2d 1238, 1259-69 (D.C. Cir. 1981), *cert. denied*, 456 U.S. 926 (1982), (total suppression unnecessary where executing officers did not abuse or disregard terms of warrant even though they incidentally seized some items not described in it). Thus, wholesale suppression is only appropriate under the "flagrant disregard" standard when the officers transform the search into an impermissible general search by ignoring the terms of the warrant and engaging in indiscriminate "fishing." *Chen*, 979 F.2d at 717.

### 4.    Conclusion

Here, the Court was not presented with evidence demonstrating how many of the seized medical records did not contain prescriptions for controlled substances. Assuming that there were

some,[5] the Court finds that the seizure of such records was due to motivations of practicality rather than indiscriminate "fishing." *Tamura*, 694 F.2d at 597.  TFO Still testified that the size of each medical record ranged from a few pages to "voluminous" and it would have taken 10 to 12 hours to complete the search if each record was reviewed individually.  Further, Agent Kallal testified that the records were not organized or segregated into any particular groupings within the three suites in NAMG and there were a limited number of officers to review the records.[6]  Additionally, Wetselaar's medical practice included pain management patients who are likely to have been prescribed controlled substances.  Finally, at the beginning of the search, Wetselaar indicated to the officers that they would be seizing all the records when asked which ones contained controlled substance prescriptions.  Under these circumstances, the Court finds that Agent Kallal's decision to seize all of the patient files at NAMG reflected the practicalities of the situation.[7]  It would have taken an unreasonable amount of time to review each patient file given the volume of files and highly disorganized fashion with which they were discovered.  Significantly, TFO Still testified that almost all of the files seized contained controlled substance prescriptions.  Therefore, the court finds that the officers who executed the search warrant did not transform the search into an impermissible general search by ignoring the terms of the

---

[5] TFO Still estimated that 96% of the 500 to 600 records seized contained controlled substance prescriptions.  Although Defendants suggested that numerous more files were seized, TFO Still was unable to confirm their suggestion.  Also, no evidence was provided to identify how many of the seized medical records did not contain a prescription for controlled substances, which would have been a critical piece of information regarding Defendant's argument.  Although not admitted into evidence, Wetselaar attached an affidavit of Michael Labovitz, a paralegal for defense counsel, who indicates that 2,747 patient files were seized from NAMG.  *See* Defs' Supplement #122-5, Exhibit A.  Significantly, the affidavit does not indicate how many files did not contain prescriptions for controlled substances.

[6] Defendants cursorily raise the issue that photos of the search of the medical office were not produced and advise the Court to draw a negative inference against the Government regarding its contention that the files were in disarray.  *See* Defs' Supplemental Brief #122, 4.  This argument is not supported by any points and authority and the Court finds that a negative inference is not justified.

[7] The Eleventh Circuit has found that the volume of documents seized and magnitude of the search is insufficient, by itself, to establish a constitutional violation because the relevant inquiry is whether the search and seizure was "reasonable under all the circumstances."  *United States v. Wuagneux*, 683 F.2d 1343, 1352 (11th Cir. 1982).

warrant and engaging in indiscriminate fishing.  Further, the Court concludes that the seized medical files that contain prescriptions for controlled substances should not be suppressed.

### B.    Search and Seizure (9) and (10): 24/7 Private Vaults

#### 1.    Execution of the Warrants

On September 29, 2011, Agent Robert Norris ("Agent Norris") applied for and obtained a search warrant to search Wetselaar's residence.  *See* Sept. 19, 2013 Hearing, Exh. B-1.  The search warrant authorized the seizure of safe deposit box keys.  *Id.*  During the search, agents seized a plastic bag containing four keys that Agent Norris recognized as safe deposit box keys.  In addition to the keys, some of which had colored tags, the bag contained three pieces of paper including: notations of "Total about 150 gold coins," "Cash, " and "40257*" with "4025=red U1656-Black 4010D" written underneath.  *See* June 3, 2013 Hearing, Exh. J-2.  Agent Norris previously learned that Wetselaar frequently purchased gold coins from American Coin Express located at 3110 East Sunset Road, Suite H, Las Vegas, Nevada.  He also knew that American Coin Express was located in the same shopping center as 24/7 Private Vaults (hereinafter, "24/7").  Agent Norris testified that 24/7 is a commercial business that provides private safe deposit boxes for its customers and he believed the keys would open safe deposit boxes there.

Agent Norris gave the plastic bag and its contents to TFO Still who, along with Agent Chris Johnson ("Agent Johnson"), went to 24/7.  At the main entrance of 24/7, TFO Still entered the code "40257*" obtained from the paper in the search of Wetselaar's residence in a keypad, which caused the panel light to change from red to green.  TFO Still testified that she and Agent Johnson did not immediately enter, but rather, were "buzzed in" by a 24/7 employee, Silvia Cordova ("Cordova").  In the lobby of 24/7, the officers identified themselves as law enforcement officers and asked Cordova whether she recognized the keys and associated numbers that they had brought with them.  The officers did not tell her who they were investigating.  She indicated that she recognized the keys by the color of their tags as well as the markings.  Cordova also recognized some of the four digit numbers listed on the papers as likely corresponding to safe deposit boxes at 24/7.

12

At this point, Cordova offered to show the officers the safe deposit boxes.  She bypassed a retinal scan designed to limit public access and escorted the officers into the VIP room containing safe deposit boxes.  Cordova indicated that 24/7 has a dual lock system for some safe deposit boxes requiring the use of two keys - a master key marked with a "M" and guard key marked with a "G." TFO Still testified that Cordova said, "You can't do this, but I can," and tried the keys the officers brought in some of the safe deposit box doors.  Cordova opened door 1656 with a pair of keys from the bag revealing the end of an unnumbered metal box about 22 inches long.  She indicated that the metal box could be pulled out and opened by releasing a latch on the top.  The two remaining keys opened doors 4010 and 4025 and exposed similar metal boxes.  Accordingly, Cordova opened three safe deposit box outer doors with the four keys provided by the officers.  The outer door numbers corresponded with the numbers written on notes in the plastic bag seized at Wetselaar's residence. Although Cordova pulled the inner metal boxes partially out, she did not open the metal boxes and officers were told to get a warrant after Cordova confirmed that the keys worked on the doors.

After being notified by TFO Still that the keys were from 24/7, Agent Norris visited 24/7 later that day.  Cordova showed Agent Norris the boxes that she previously showed TFO Still and Agent Johnson.  In addition, Cordova told Agent Norris that she did not know who the boxes belonged to, but 24/7's information technology employee could find out.  Cordova also indicated that the owners may have duplicate keys and expressed concern that the boxes were not safe from being opened.  She suggested that metal boxes located within the three safe deposit boxes be moved into a large floor safe located in the same VIP vault room.  The floor safe would be accessible only to the officers and the boxes could remain there until a search warrant was obtained.  Cordova opened the three safe deposit doors numbered 1656, 4010, and 4025 and moved two of the metal boxes into the floor safe.  Agent Johnson moved the third metal box, which was heavier and larger, into the same floor safe.  TFO Still and Agent Norris testified that the metal boxes were not opened and prior to the relocation, they informed Cordova that she was moving the boxes of her own free will.  TFO Still mentally noted which box corresponded to which safe deposit door number and the floor safe was locked with a

combination provided by Cordova.  A piece of tamper-proof evidence tape was placed on the floor

safe by the officers.  Cordova testified that the officers retained the combination to the floor safe.

On October 2, 2011, Cordova advised TFO Still that safe deposit box door 4010 is associated

with door 1023 by a retinal scan.  Cordova voluntarily placed a screw in the key hole for door 1023 to

prevent access by anyone.  She was not asked to do this by any officer or asked to perform any further

investigation of the boxes.  On October 3, 2011, Agent Norris applied for, received, and executed a

search warrant to seize items in safe deposit boxes 4010, 4025, and 1656.  *See* Sept. 19, 2013 Hearing,

Exh. I-1.  The boxes contained currency, gold and silver coins, and paperwork associated with the

vault.  In addition, box 4010 contained a rental agreement for another safe deposit box, number 1023.

On October 5, 2011, Agent Norris obtained and executed another search warrant to search and seize

items in safe deposit box 1023.  *See* Sept. 19, 2013 Hearing, Exh. J-1.  The officers used the services

of a locksmith identified by 24/7 to drill the box door open.  In applying for the warrants, Agent Norris

did not mention that officers had entered the VIP room, Cordova had opened safe deposit doors 4010,

4025, and 1656 with keys from the search of Wetselaar's residence, and the metal boxes had been

moved to a floor safe.

The owner of 24/7, Elliot Shaikin ("Shaikin"), testified that 24/7 provides privacy,

accessibility, and confidentiality to its customers.  Shaikin indicated that 24/7 distinguishes itself from

typical safe deposit box arrangements because its customers are not required to use a name, social

security number, or address; customers gain access to their safe deposit boxes by passing a retinal

scan, entering a private identification number, and using keys.  Shaikin further testified that 24/7's

longstanding policy requires law enforcement officers to obtain a search warrant prior to accessing a

safe deposit box.  He indicated that Cordova's actions in opening the safe deposit doors are contrary to

24/7's policy and allowing an officer access without a warrant does not further a legitimate business

purpose.

## 2. Fourth Amendment Analysis

Defendants contend that an illegal search and seizure occurred when Cordova opened the safe

14

deposit box doors 4010, 4025, and 1656 with keys provided by the officers and exposed the metal boxes.  Moreover, Defendants argue that their Fourth Amendments rights were further violated when the metal boxes were removed from behind the doors and placed in the floor safe because the boxes are "effects" protected from unwarranted search and seizure.  They also allege the officers actions in moving the boxes into the floor safe and into the custody of 24/7 amounted to trespass and conversion.  Finally, Defendants contend that box 1023 is "fruit of the poisonous tree" because it was discovered as the result of the prior illegal search of box 4010.[8]

In response, the Government contends that Cordova's actions in opening the safe deposit box outer doors and moving the inner metal boxes into 24/7's floor safe do not constitute a search and seizure in violation of the Fourth Amendment.  The Government highlights the fact that the metal boxes were never opened prior to obtaining a search warrant and Cordova was advised by the officers that she was acting as a private citizen.  Finally, the Government argues that even if Cordova's behavior constitutes government action it was similar to freezing the premises while securing a search warrant and therefore not an unlawful search and seizure.

### a.    Initial Opening and Relocation of Boxes 4010, 4025, and 1656

The Fourth Amendment addresses "the right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures."  U.S. Const. Amend. IV.  It protects people's reasonable and legitimate expectations of privacy.  *Katz v. United States*, 389 U.S. 347 (1967).  More specifically, the Fourth Amendment "protects two types of expectations, one involving 'searches,' the other 'seizures.'  A 'search' occurs when the government intrudes upon an expectation of privacy that society is prepared to consider reasonable.  A 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property."  *United States v. Jacobsen*, 466 U.S. 109, 113 (1984).  In *United States v. Jones*, 132 S.Ct. 945, 949-50

---

[8] The Court notes that Defendants claim that Litwin is the owner of boxes 4010 and 1023 and Wetselaar is the owner of boxes 4025 and 1656.  *See* Defs' Mot. #65, 20.  The Government does not object to their standing to challenge the search and seizures of the contents of their respective safe deposit boxes.

(2012), the Supreme Court confirmed that a property-based or trespass-based approach, in addition to the *Katz* reasonable expectation of privacy approach, may be used to determine whether a Fourth Amendment search has occurred.  In doing so, the Supreme Court found that a search occurred when the Government "physically occupied private property for the purpose of obtaining information."  *Id.* at 949-50.

Here, when Cordova entered the VIP room and used the keys provided by TFO Still and Agent Johnson to open the doors of safe deposit boxes 4010, 4025, and 1656 a search occurred.  The Court finds that as renters of those boxes, Defendants' had a reasonable expectation of privacy in the contents, which include the space inside the box and the inner metal liner itself.  In addition, the Court determines that the boxes were opened for the purpose of obtaining information specifically, to confirm that the keys found in the search of Wetselaar's residence were associated with those 24/7 safe deposit boxes.  Further, the Court finds that a seizure occurred when the boxes were moved to the floor safe and the evidence tape was placed to seal the safe's door.  At that point, Defendant's property was no longer accessible, constituting a meaningful interference with their possessory interests.  Upon finding that a search and seizure occurred within the meaning of the Fourth Amendment, the Court will now analyze whether it was unlawful and should result in the suppression of the contents of safe deposit boxes 4010, 4025, and 1656.

### b.    Private Action

A fundamental principle of constitutional law is that the Fourth Amendment is a constraint on government action rather than on the actions of private individuals.  *See United States v. Goldstein*, 532 F.2d 1305, 1311 (9th Cir. 1976).  However, if a private individual acts as an instrument or agent of the state in conducting a search or seizure, then Fourth Amendment interests are implicated.  *See Coolidge v. New Hampshire*, 403 U.S. 443, 487 (1971).  A person is a government agent "when the government authorizes, directs and supervises that person's activities and is aware of those activities."  *United States v. Jones*, 231 F.3d 508, 517 (9th Cir. 2000).  While a certain degree of governmental participation is necessary before a private citizen is transformed into an agent of the state, *de minimis*

or incidental contacts between the citizen and law enforcement agents prior to or during the course of a search or seizure will not subject the search to fourth amendment scrutiny. *See United States v. Walther*, 652 F.2d 788, 791 (9th Cir. 1981). The government must be involved either directly as a participant or indirectly as an encourager of the private citizen's actions before the citizen is deemed to be an instrument of the state. *See United States v. Gumerlock*, 590 F.2d 794, 800 (9th Cir. 1979). There exists a "gray area" between the extremes of overt governmental participation and total absence of government involvement. *United States v. Sherwin*, 539 F.2d 1, 6, n.5 (9th Cir. 1976) (en banc). Two critical factors in the "instrument or agent" analysis are: (1) whether the government knew of and acquiesced in the intrusive conduct, and (2) whether the party performing the search intended to assist law enforcement efforts or to further his own ends. *United States v. Miller*, 688 F.2d 652, 657 (9th Cir. 1982).

### (1). Knowledge and Acquiescence

In cases where a private individual conducted a search or seizure, the burden is on the defendant to establish government involvement. *See United States v. Young*, 153 F.3d 1079, 1080 (9th Cir. 1998*); see also United States v. Snowadzki*, 723 F.2d 1427, 1429 (9th Cir. 1984). The court must consider the evidence "in light of all the circumstances of the case." *Coolidge*, 403 U.S. at 487. The Government alleges that they did not search the boxes because they did not instruct or coerce Cordova into opening the boxes. Although the officers told Cordova that she was acting on her own volition and not at their request, it is beyond dispute that the officers knew of, acquiesced in, and participated in Cordova's opening of the doors to the safe deposit boxes and moving the metal boxes to the floor safe. In fact, Agent Johnson assisted Cordova in moving one of the metal boxes to the floor safe because it was heavy. The officers also retained the combination for the floor safe and placed evidence tape to prevent access until a warrant was obtained. The officers' mere verbal warning that Cordova was not acting at their request is insufficient to insulate them from knowing and acquiescing in her behavior. Therefore, the Court finds that the first factor in the instrument or agent analysis is met.

17

<u>(2).</u>    **Intention**

A search conducted by a business for its own purpose without instigation or participation of government officers does not implicate the Fourth Amendment.  *See Miller*, 688 F.2d at 657 (citing *Gundlach v. Janing*, 401 F. Supp. 1089, 1093 (D. Neb. 1975) (airline inspection of baggage); *see also Young*, 153 F.3d at 1080 (fedex security inspection of parcel pursuant to internal security policy).  The Government argues that Cordova acted in order to maintain business as usual at 24/7 and minimize the presence of law enforcement officers.  However, Shaikin testified that the business interests of 24/7, such as safeguarding customers' privacy, accessibility, and confidentiality, were best served by requiring officers to obtain a search warrant to gain access to safe deposit boxes.[9]  It may be true that 24/7 had a business interest to maintain minimal and discrete interactions with law enforcement and be cooperative.  However, TFO Still testified that she and Agent Johnson were discrete in their interactions with Cordova.  Similarly, Cordova did not express a concern about the officers acting in an indiscrete or assertive manner.

Further, the Court finds that Cordova volunteered to open and relocate the boxes in violation of 24/7's unwritten policy in order to assist law enforcement efforts.  She testified that she sought to verify that the keys provided by the officers opened the doors and suggested moving the boxes to prevent the owners from accessing them.  The officers' surprise at how cooperative Cordova was and warning that she was acting on her own is insufficient to establish that she acted in furtherance of a business purpose.  Accordingly, the Court determines that Cordova opened and relocated boxes 4010, 4025, and 1656 with the knowledge and acquiescence of the officers in order to assist their investigation.  As such, Cordova became an agent for the government and her search and seizure of boxes 4010, 4025, and 1656 violates the Defendants' Fourth Amendment rights.

---

[9] The Court notes that 24/7 converted their policy of requiring officers to obtain a search warrant to access safe deposit boxes to writing after the events at issue.  However, the Court finds the fact that the policy was not reduced to writing at the time of these events is not determinative because the policy was known to all employees, including Cordova.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<u>c.</u>        **Independent Source Exception**

The Court has determined that Defendants' Fourth Amendment rights were violated when the safe deposit keys were used to open doors 4010, 4025, and 1656 and when the metal boxes contained within those doors were moved to the floor safe.  The unlawful evidence obtained as the result of those violations was the knowledge that the safe deposit keys seized from Wetselaar's residence corresponded to boxes 4010, 4025, and 1656 located at 24/7.  No information was learned as to the contents of the safe deposit boxes because the metal liners were not opened.  Accordingly, the Court must now determine what the remedy should be for the Fourth Amendment violations.

The exclusionary rule prohibits the introduction of evidence regarding: (1) tangible materials seized during an unlawful search, *Weeks v. United States*, 232 U.S. 383 (1914), and (2) testimony concerning knowledge acquired during an unlawful search, *Silverman v. United States*, 365 U.S. 505 (1961).  The exclusionary rule is a judicially prescribed remedial measure and as "with any remedial device, the application of the rule has been restricted to those areas where its remedial objectives are thought most efficaciously served."  *United States v. Calandra*, 414 U.S. 338, 348 (1974).  The exclusionary rule reaches not only primary evidence obtained as a direct result of an illegal search or seizure, *Weeks*, 232 U.S. 383, but also evidence later discovered and found to be derivative of an illegality or "fruit of the poisonous tree."  *Nardone v. United States*, 308 U.S. 338, 341 (1939).  The Supreme Court has clarified that the exclusionary rule "extends as well to the indirect as the direct products" of unconstitutional conduct.  *Wong Sun v. United States*, 371 U.S. 471, 484 (1963).

On the other hand, "the exclusionary rule has no application [where] the Government learned of the evidence 'from an independent source.'"  *Id*. at 487.  The question to be resolved when it is claimed that evidence subsequently obtained is "tainted" or is "fruit" of a prior illegality is whether the challenged evidence was "come at by exploitation of [the initial] illegality or instead by means sufficiently distinguishable to be purged of the primary taint."  *Id*. at 488.  For example, in *Segura v. United States*, 468 U.S. 796, 805 (1984), the Supreme Court found suppression was not required despite the officers' illegal entry onto private premises because the information on which the warrant

19

was secured came from sources wholly unconnected with the entry and known to the officers prior to entry.  In fact, the Supreme Court reiterated that it "has been well established that for more than 60 years that "evidence is not to be excluded if the connection between the illegal police conduct and discovery and seizure of evidence is 'so attenuated as to dissipate the taint,' . . . for example, if police had an 'independent source' for discovery of the evidence."  *Segura*, 468 U.S. at 805 (1984) (citing *Nardone*, 308 U.S. at 341).  Accordingly, the "independent source" doctrine permits the introduction of evidence initially discovered during, or as a consequence of, an unlawful search, but later obtained independently from lawful activities untainted by the initial illegality.  *Silverthorne Lumber Co. v. United States*, 251 U.S. 385 (1920); *see also United States v. Cella*, 568 F.2d 1266, 1285-86, (9th Cir. 1977) (finding evidence not tainted if information gained from illegal entry merely intensified investigation).  The Government should not be put in a worse position than it would have been absent a Fourth Amendment violation when the challenged evidence has an independent source.  *See Nix v. Williams*, 467 U.S. 431, 443 (1984) (independent source exception to the exclusionary rule "allows admission of evidence that has been discovered by means wholly independent of any constitutional violation"); *see also United States v. Reed*, 15 F.3d 928 (9th Cir. 1994) (independent evidence provided sufficient probable cause for search warrant for hotel room after tainted evidence from prior illegal search excised); *Murray v. United States*, 487 U.S. 533, 544 (1988) (remanding for determination that the search warrant was a genuinely independent source of information).

Here, the officers had abundant probable cause in advance of their entry into the 24/7 VIP room with Cordova to believe that evidence of the crimes they were investigating was located there.  First, the search warrant for Wetselaar's residence authorized the seizure of safe deposit box keys.  In approving the seizure of safe deposit box keys, the magistrate judge signaled that there was probable cause to believe that evidence of the alleged criminal activity would be found in safe deposit boxes.  Second, Agent Norris knew that Wetselaar periodically purchased gold coins at the American Coin Express, which was located near 24/7.  He believed that there may be evidence of the transactions he was investigating at 24/7 and after seizing the plastic bag with keys during the search of Wetselaar's

residence, Agent Norris believed the keys would open boxes at 24/7.  Moreover, TFO Still learned that the seized plastic bag contained accurate information and related to 24/7 because she entered the pin code written on one of the notes in the bag, which turned the access light from red to green. Additionally, when TFO Still and Agent Johnson spoke with Cordova in the 24/7 front office - a common area where neither defendant enjoyed (or has claimed) an expectation of privacy - Cordova identified the keys as likely being from 24/7 and the numbers 4010, 4025, and 1656 as consistent with numbers of 24/7 safe deposit boxes.  With this knowledge, Agent Norris testified that he believed that he could have applied for a search warrant *before* he went into the VIP room.  Under these circumstances, the Court finds that Agent Norris would have applied for a search warrant to search boxes 4010, 4025, and 1656 even if Cordova had not allowed the officers to access the VIP vault.  *See Murray*, 487 U.S. at 541 (requiring the court to find that agents would have sought a warrant prior to the illegal entry of the place to be search and discovery of contraband).  The information known to Agent Norris and set forth in his affidavit, without any mention of the knowledge acquired when the keys were used to open the doors, established probable cause to search boxes 4010, 4025, and 1656 to the satisfaction of the magistrate judge who authorized the search warrant on October 3, 2011.[10]

Accordingly, the evidence discovered in boxes 4010, 4025, and 1656 should not be suppressed as "fruit of the poisonous tree" derived from the initial illegal search or seizure.  *Wong Sun* , 371 U.S. at 488.  As discussed previously, Court has determined that Cordova acted as a government agent and there was a Fourth Amendment violation prior to the securing of a search warrant.  However, there was an independent source for the discovery of the evidence namely, the subsequent search warrant that found probable cause based on untainted information.  *See Segura*, 468 U.S. 813-814.  The information contained in Norris' affidavit came from sources wholly unconnected with the VIP room entry, it was known to the officers before they entered the VIP room, and not derived from or related

---

[10] This Court previously analyzed, under *Franks*, the significance of the omission of information regarding the initial entry into the VIP room in Agent Norris' affidavit.  438 U.S. 154.  It determined that although misleading, the omission did not materially effect the probable cause determination.  *See* Report and Recommendation #109, 9-11.

to the entry into the VIP room.  Therefore, it is beyond dispute that the information possessed by the officers before they entered the VIP room constitutes an independent source for the discovery and seizure of the challenged evidence - the contents of the safe deposit boxes.  Moreover, although confirmation that the seized keys accessed the safety deposit box doors was acquired unlawfully, it was also available at the time of the entry pursuant to the warrant.  Given that the later acquisition of this same knowledge - the keys opened boxes 4010, 4025, and 1656 - was not the result of the earlier entry, then the independent source doctrine applies.  *See Murray*, 487 U.S. at 541 (knowledge of facts and tangible evidence discovered as the result of the illegal entry into a warehouse is nevertheless admissible if the subsequent seizure is genuinely independent of the earlier, tainted acts).  In conclusion, the evidence in boxes 4010, 4025 and 1656 was discovered during a search conducted under a valid warrant, which is a "means sufficiently distinguishable" to purge the evidence of any "taint" arising from the prior illegal search.  *Wong Sun*, 371 U.S. at 488.  The illegality of the initial search of boxes 4010, 4025, and 1656 does not warrant suppression of their contents because of the independent source exception.

### d.    Seizure, Trespass, & Conversion of Boxes 4010, 4025, and 1656

Defendants contend that the seizure of boxes 4010, 4025, and 1656 violates the Fourth Amendment and warrants suppression of the evidence.  In addition, Defendants cursorily allege that the relocation of the metal liners into the floor safe and thus, transfer of Defendants' property into the custody of 24/7, amounts to trespass and conversion.[11]  In response, the Government contends that the relocation of boxes 4010, 4025, and 1656 into the floor safe is akin to freezing the premises for a reasonable period of time to obtain a search warrant.

Different interests are implicated by a seizure than by a search.  *See Jacobsen*, 466 U.S. at 113.  A seizure affects a person's possessory interests while a search affects a person's privacy interests.  *Id*.

---

[11] The Court notes that Defendants failed to provide points and authority regarding their trespass and conversion allegation.  *See* LCR 47-9 (failure to file points and authorities constitutes consent to denial of motion).

The Supreme Court has recognized the generally less intrusive nature of a seizure and approved the warrantless seizure of property until a warrant could be secured despite the fact that a warrantless search would be impermissible. *See Segura*, 468 U.S. at 810 (securing a dwelling until officers obtain a search warrant, where probable cause exists to conduct a search, in order to prevent the destruction or removal of evidence, is not an unreasonable seizure of the dwelling or its contents); *see also United States v. Chadwick*, 433 U.S. 1, 13-14 (1977); *Chambers v. Maroney*, 399 U.S. 42, 51-52 (1970). Accordingly, the Fourth Amendment allows the seizure of property, in exigent circumstances, pending the issuance of a search warrant to examine its contents, when officers have probable cause to believe that it contains contraband or evidence of a crime. *See United States v. Place*, 462 U.S. 696, 701 (U.S. 1983).

First, the Court must consider whether there was probable cause to seize the evidence and exigent circumstances to do so prior to obtaining a warrant. Here, as determined by the magistrate judge who issued the search warrant, there was probable cause to believe that boxes 4010, 4025, and 1656 contained evidence of the crimes under investigation. Defendants contend that the search warrant did not authorize the seizure of the contents of the safe deposit boxes because they were no longer located behind the doors from which they came. In fact, the search warrant authorized the search of the three boxes "with corresponding assigned number" 4010, 4025, and 1656. Sept. 19, 2013 Hearing, Exh. I-1. Agent Norris testified that the officers were aware of which box was associated with which safe deposit door when placed in the floor safe. When executing the warrant, the officers seized the items within the boxes. Therefore, the Court concludes that Defendants have not provided a sufficient Fourth Amendment basis to suppress the contents of the boxes.[12] Additionally, it was reasonable to believe, based on Cordova's concern that the contents of the boxes were accessible to others with a duplicate key, that the evidence may be removed. So, safeguarding the evidence while a warrant was secured was justified in these exigent circumstances.

---

[12] Defendants' principal privacy interest is the *contents* of the safe deposit box, not the box or the door itself, which is exposed to view by others who enter the 24/7 vault.

1    Second, the Court must consider whether the time period of the warrantless seizure is

2  reasonable.  A warrantless seizure of property is reasonable for a "time period . . . no longer than

3  reasonably necessary for police, acting with diligence, to obtain the warrant."  *Illinois v. McArthur*,

4  531 U.S. 326, 332 (2001).  Agent Norris testified that after visiting 24/7 on September 29, 2011, he

5  immediately prepared an application for a search warrant.  A warrant was issued by a magistrate judge

6  on Monday, October 3, 2011 at 9:30 a.m.  The Court finds that, under the circumstances, Agent Norris

7  acted with diligence in obtaining the warrant and the weekend delay was reasonable.  *See, e.g., United*

8  *States v. Dass*, 849 F.2d 414, 415 (9th Cir. 1988) (delays of seven to twenty-three days to search

9  mailed packages unreasonable); *see also United States v. Van Leeuwen* 397 U.S. 249 (1970) (delay of

10  twenty-nine hours in obtaining a search warrant for mailed packages reasonable); *United States v.*

11  *Adams*, 176 F.3d 485 (9th Cir. Apr. 23, 1999) (delay over weekend to obtain a search warrant for

12  luggage under circumstances was not unreasonable under the totality of the circumstances); *United*

13  *States v. Ames*, 106 F.3d 409 (9th Cir. Jan. 23, 1997) (Monday mid-day application for a search

14  warrant based on late Friday afternoon probable cause was adequately fast); *United States v. Lux*, 905

15  F.2d 1379, 1382 (10th Cir. 1990) (delay from Saturday to Monday is not unreasonable to obtain a

16  warrant for mailed package); *Payton v. New York*, 445 U.S. 573, 588 (1980) (finding a package may

17  be seized for a longer period of time than a residence given the heightened constitutional protection

18  for "preserving the privacy and sanctity of the home").  Agent Norris prepared the application for the

19  search warrant in the evening of Thursday, September 29, 2011 and it was approved on Monday,

20  October 3, 2011 at 9:30 a.m.[13]  TFO Stills and Agent Norris testified that the magistrate judge was not

21  available to review the affidavit until after the weekend.  Defendants provided no evidence indicating

22  that they attempted to access the safe deposit boxes during that time.  In addition, Defendants'

23  possessory interest in the boxes was minimal because the keys to the boxes had already been lawfully

24

25

26

_____

27     [13] Defendants also argue that the magistrate judge was not informed that the contents of the boxes
had been moved and her probable cause determination is insufficient.  The Court previously rejected this

28  argument and no further discussion is needed.  *See* Order #118.

seized during the search of Wetselaar's residence.  Therefore, the Court finds that the warrantless seizure of boxes 4010, 4025, and 1656 until a search warrant could be obtained does not justify the suppression of their contents.

Finally, the Court finds that 24/7's actions in assisting with the warrantless seizure do not warrant suppression.  Cordova testified that the officers retained the combination of the floor safe after the boxes were relocated until the search warrant was obtained.  In contrast, TFO Still testified that Cordova also retained the combination.  Assuming that 24/7 retained the combination, the evidence tape placed on the floor safe was intact when the search warrant was executed and there is no evidence that 24/7 had any greater access to the contents of the boxes after they were moved.  Accordingly, the temporary seizure of the safe deposit boxes while a search warrant was obtained was reasonable under the circumstances and does not warrant suppression of the contents of boxes 4010, 4025, and 1656.

### e.        Search of Box 1023

On October 2, 2011, Cordova contacted TFO Still with information responsive to Agent Norris' prior inquiry regarding the ownership of other boxes in 24/7.  Cordova advised TFO Still that 24/7 records show that box 4010 is linked to box 1023 by a matching retinal scan.[14]  Moreover, Cordova placed screws in the key holes of box 1023 to prevent it form being accessed.  She testified that she took this action without being asked by or consulting the officers.  Subsequently, on October 3, 2011, officers discovered a rental agreement for box 1023 while executing the search warrant for box 4010.  On October 5, 2011, Agent Norris obtained a search warrant for box 1023 and submitted an affidavit that referenced the discovery the rental agreement for box 1023 in box 4010.  *See* Sept. 19, 2013 Hearing, Exhs J-1 and J-2.

Preliminarily, both Defendants and the Government agree that only Litwin has standing to

---

[14] The Supreme Court has held repeatedly that "the Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by him to Government authorities, even if the information is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in a third party will not be betrayed."  *United States v. Miller*, 425 U.S. 435, 443 (1976).

challenge the search of box 1023.  Litwin contends that the search of box 1023 and its contents are fruit of the poisonous tree based on the alleged prior illegal search and seizure of box 4010.  The Government argues that the search of box 4010 did not violate the Fourth Amendment so the subsequent search of box 1023 should not be suppressed as fruit of the poisonous tree.

First, the Court will address Cordova's actions in placing screws into the keyholes of box 1023, which may have constituted a seizure of box 1023 and its contents.  *See Jacobsen*, 466 U.S. at 113 (a "seizure" of property occurs when there is some "meaningful interference" with an individual's possessory interests in that property).  Here, Litwin's access to the contents of box 1023 was interfered with because he would need to utilize a drill rather than a key to open the box.  However, Agent Norris indicated that Cordova took this action prior to notifying TFO Still of the box's existence.  Further, Cordova voluntarily placed the screws into the keyholes.  Unlike with boxes 4010, 4025, and 1656, there is no evidence that the Government knew of and acquiesced in Cordova's conduct with box 1023 or was contacted before she did so.  Therefore, the Court finds that Cordova did not act as a government agent, but rather, acted as a private individual.  *See Miller*, 688 F.2d at 657; *see also Jones*, 231 F.3d at 517 (a person is a government agent "when the government authorizes, directs and supervises that person's activities and is aware of those activities"); *Gumerlock*, 590 F.2d at 800 (Government must be involved either directly as a participant or indirectly as an encourager of the private citizen's actions before the citizen is deemed to be an instrument of the state).  Assuming that Cordova's placement of the screws in the keyholes was a "seizure" of Litwin's property, the Fourth Amendment is not implicated by a private individual's action.  *See Goldstein*,532 F.2d at 1311.

Furthermore, as discussed above, the Court determined that the contents of box 4010 should not be suppressed based on the independent source rule.  Consequently, the Court finds that the rental agreement for box 1023, which was found in box 4010, is not "tainted" evidence subject to suppression as "fruit of the poisonous tree."  *Wong Sun*, 371 U.S. at 488.  Agent Norris' citation of the rental agreement for box 1023 found in box 4010 in his affidavit constitutes untainted evidence.  Therefore, the Court finds that the subsequent search of box 1023 was not illegal, but rather, based on

26

a search warrant with untainted information to support the probable cause determination. Accordingly, the Court finds that Litwin's request for suppression of the contents of the search of box 1023 should be denied.

### 3.   Conclusion

The Court has determined that Defendants' Fourth Amendment rights were violated with respect to the search and seizure of safe deposit boxes 4010, 4025, and 1656. Cordova's actions in opening the boxes and moving the inner metal liners constitutes government action based on the knowledge and acquiescence of the officers involved and her intention to assist the investigation. Nevertheless, the Court concludes that the contents of boxes 4010, 4025, and 1656 should not be suppressed. The Court finds that there is sufficient untainted information to support the search warrant of boxes 4010, 4025, and 1656 to remove the taint of the prior illegal search and seizure. For example, at the point that TFO Still entered the code to open 24/7's main entrance, it was reasonable to assume that the code, along with safe deposit box keys included in the plastic bag, were associated with 24/7. In addition, Agent Norris would have requested a search warrant prior to the entry of the 24/7 VIP room. Moreover, the Court finds that the contents of box 1023 are not fruit of the poisonous tree. Accordingly, the Court will recommend that Defendants' motion to suppress evidence from the 24/7 boxes, search and seizure (9) and (10), be denied.

## II.   Motion for Return of Seized Property and Assets Pursuant to Rule 41(g)

The Court will now address Defendants' Motion for Return of Seized Property and Assets Pursuant to Federal Rule of Criminal Procedure 41(g) contained within their Omnibus Motion (#65). Defendants request the return of all property and assets seized by the Government as a result of all ten searches and seizures because the officers exceeded the scope of the warrants and the property is *fruit of the poisonous tree* based on a prior illegal search.[15] In doing so, they rely on Rule 41(g) and *United*

---

[15] Defendants also assert a third argument that the property should be returned because the affidavits in support of the warrants contain misleading omissions and false statements. As previously discussed, the Court denied Defendants' *Franks* challenge so this argument will not be addressed further. *See* Order #118.

27

*States v. Comprehensive Drug Testing, Inc.*, 621 F.3d 1162 (9th Cir. 2010) for the proposition that property and assets seized during an unlawful search and seizure may be returned to a defendant. In particular, Defendants contend that the officers' conduct in obtaining and executing all of the warrants constitutes intentional wrongdoing rather than a technical or good faith mistake.

In contrast, the Government argues that Defendants have failed to articulate what property and assets they want returned with specificity. Further, the Government contends that the assets were validly seized and the authority that Defendants cite related to forfeiture is inapplicable because only preliminary seizures have occurred.

### A.    Rule 41 Standard

The relevant part of Federal Rule of Criminal Procedure 41 provides:

> A person aggrieved by an unlawful search and seizure of property or by the deprivation of property may move for the property's return. . . . If [the court] grants the motion, the court must return the property to the movant, but may impose reasonable conditions to protect access to the property and its use in later proceedings.

Fed. R. Crim. P. 41(g). Generally, a Rule 41(g) motion is properly denied "if the defendant is not entitled to lawful possession of the seized property, the property is contraband or subject to forfeiture or the government's need for the property as evidence continues." *United States v. Van Cauwenberghe*, 934 F.2d 1048, 1061 (9th Cir. 1991). A criminal defendant is presumed to have the right to the return of his property once it is no longer needed as evidence and the burden of proof is on the Government to show "that it has a legitimate reason to retain the property" that is reasonable under all of the circumstances. *Id*. (quoting *United States v. Martinson*, 809 F.2d 1364, 1369 (9th Cir. 1987)); *see also United States v. Mills*, 991 F.2d 609, 612 (9th Cir. Cal. 1993). The Government may meet its burden "by demonstrating a cognizable claim of ownership or right to possession adverse to that of [the defendant]." *Mills*, 991 F.2d at 612 (citation omitted).

### B.    Rule 41 Analysis

The basis for Defendants' motion is that all of the assets and property were illegally seized. Contrary to Defendants' position, the Court has determined that the inclusion of the calculation of $3.6 million in proceeds from the illegal drug distribution allegations does not undermine the search

28

warrants in this case.  *See* Order #118 (finding that the warrants were sufficient even though the $3.6 million figure was misleading).  The Court has also determined that even if medical records were seized outside the scope of the warrant, those medical records within the scope of the warrant should not be suppressed.  In addition, the Court found that the officers' actions in seizing all medical records due to practical concerns that the files could not be feasibly sorted on site in a timely fashion were justified.[16]  Further, the Court has found that, under the independent source doctrine, the search and seizure of the contents of the safe deposit boxes was not tainted by the officers' initial actions.  Additionally, the Court considered evidence consisting of the warrants for searches (1) through (10) that include authorization for the seizure of funds and other property as forfeitable proceeds of the offenses under investigation.  After careful review of all the evidence, Court finds that the Government did not obtain Defendants' assets and property through intentional wrongdoing.  Consequently, the Court finds that return of the seized property and assets is not justified on the basis that there was no unlawful search and seizure.

The Court notes that Rule 41(g) is broader than the exclusionary rule and would allow the return of property lawfully seized under certain circumstances.[17]  *See Comprehensive Drug Testing Inc.*, 621 F.3d at 1173 (noting Rule 41(e) was renumbered to 41(g) and amended to make clear that the movant need not establish an unlawful search to request return of property no longer needed for the government's investigation).  The court must consider whether the "United States' legitimate interests can be satisfied even if the property is returned" and therefore, it would be  unreasonable for the Government to retain the property.  *Ramsden v. United States*, 2 F.3d 322, 326 (9th Cir. 1993).  For

---

[16] The Court notes that Defendants have not requested the return of medical records pursuant to Rule 41(g).

[17] The Ninth Circuit notes that a Rule 41(g) remedy and the exclusionary rule remedy serve fundamentally different purposes.  *See Comprehensive Drug Testing, Inc.*, 621 F.3d at 1172-73.  Suppression of property helps ensure that law enforcement adhere to constitutional norms and return of property ensures that property and privacy interests of those impaired by the seizure are safeguarded.  Accordingly, the analysis for a Rule 41(g) motion for return of property is distinct from the Fourth Amendment suppression analysis.

29

example, in *Comprehensive Drug Testing Inc.*, the Ninth Circuit ordered illegally seized drug testing data beyond the scope of the search warrant to be returned to its owners, who were not defendants in the pending criminal case.  621 F.3d at 1172.  Here, Defendants filed their motion post-indictment and the indictment includes nine forfeiture allegations.[18]  It is well-settled that the Government may defeat a Rule 41(g) motion by demonstrating that the property is subject to federal forfeiture.  *See United States v. Fitzen*, 80 F.3d 387, 389 (9th Cir. 1996).  Accordingly, the Government has demonstrated that it has a cognizable claim of ownership and right to possession adverse to Defendants in the evidence resulting from all ten of the searches and seizures.  In conclusion, the Court finds that seized property and assets should not be returned pursuant to Rule 41(g) and Defendants' motion should be denied.

**III.**    **Motion for Return of Seized Property to Pay Legal Fees**

The Court will now address Defendants' Motion for Return of Seized Property to Pay Legal Fees contained within their Omnibus Motion (#65).  The Court considered the portions of the following that relate to the requested relief: Government's Response (#84), filed on April 19, 2013, Defendants' Reply (#90), filed on May 10, 2013, and Defendants' Supplement (#122), filed on October 15, 2013.  In addition, the Court conducted a evidentiary hearing on June 3, 2013, September 19, 2013, and October 17, 2013.  Finally, the Court considered supplemental briefing including: Litwin's Financial Affidavit (#125), filed on October 17, 2013, Defendants' Brief (#127) and Exhibits (#128-#129), filed on October 31, 2013, and Government's Memorandum (#130), filed on October 31, 2013.

---

[18] The Ninth Circuit articulated four factors to be considered before a court can reach the merits of a pre-indictment Rule 41(g) motion including: whether the Government displayed a callous disregard for the constitutional rights of the movant, whether the movant has an individual interest in and need for the property he wants returned, whether the movant would be irreparably injured by denying return of the property, and whether the movant has an adequate remedy at law for the redress of his grievance. *Ramsden v. United States*, 2 F.3d 322, 325 (9th Cir. 1993).  Here, the Rule 41(g) motion was filed post-indictment and therefore, the Court does not need to determine if it has equitable jurisdiction and may instead consider the reasonableness of the continued retention of property.

Defendants contend that they have made a sufficient preliminary showing to demonstrate that the seized assets are needed to pay defense counsel.  As such, Defendants argue that a *Monsanto* hearing is required to determine whether probable cause exists to believe Defendants committed the charged offenses and that the seized assets are forfeitable.  *United States v. Monsanto*, 491 U.S. 600 (1989).  In response, the Government contends that Defendants' are not entitled to a post-seizure, pre-trial *Monsanto* hearing because they have not met their burden of providing sufficiently definite, specific, and detailed proof.  Accordingly, the Government alleges that Defendants' Sixth Amendment right to counsel concern dissipates because there are unseized assets with which they can use to retain private counsel.

### A.    Monsanto Hearing Standard

The Supreme Court has recognized a qualified right to counsel of choice for criminal defendants pursuant to the Sixth Amendment.  *Powell v. Alabama*, 287 U.S. 45, 53 (1932).  Further, the Ninth Circuit has found that denial of the qualified right to counsel of choice  is reversible error.  *United States v. Ray*, 731 F.2d 1361, 1365 (9th Cir. 1984).  Nevertheless, the Supreme Court has found "a strong governmental interest in obtaining full recovery of all forfeitable assets," which "overrides any Sixth Amendment interest in permitting criminals to use assets adjudged forfeitable to pay for their defense."  *Caplin & Drysdale v. United States*, 491 U.S. 617, 631 (1989).  As such, the Supreme Court clarified that the forfeiture of illicit proceeds or other assets utilized to facilitate criminal activity that would otherwise be used to pay attorney fees does not violate a criminal defendant's qualified right to counsel of choice embodied in the Sixth Amendment and Due Process Clause of the Fifth Amendment.  *Id.*; *see also Monsanto*, 491 U.S. 600.  "A defendant has no Sixth Amendment right to spend another person's money for services rendered by an attorney even if those funds are the only way that the defendant will be able to retain the attorney of his choice."  *Caplin & Drysdale*, 491 U.S. at 626.

Where a defendant provides sufficient evidence to make a threshold showing that seized assets are needed to pay for his counsel of choice, the Fifth and Sixth Amendments require the court to

conduct a post-seizure, adversary hearing.  *Monsanto*, 491 U.S. 600; *see also United States v. Kaley* 677 F.3d 1316 (11th Cir. 2009), *cert. granted* 133 S.Ct. 1580 (2013).  In doing so, the burden is on the Government to show that there is probable cause (1) to believe that the defendant committed the crime that serves as the basis for the forfeiture and (2) the property specified as forfeitable is properly forfeitable, meaning traceable to the charged crime.  *Id.*[19]  To obtain a *Monsanto* hearing, a defendant must make a preliminary showing that he is unable to retain his choice of counsel without the seized assets.[20]  The Ninth Circuit has not clearly stated what type of proof is required for this preliminary showing, but one case is illuminating.[21]  In *United States v. Unimex, Inc.*, 991 F.2d 546 (9th Cir. 1993), the court found that to determine whether a hearing is required, "the court must decide whether the moving papers filed, including affidavits, are "sufficiently definite, specific, detailed, and nonconjectural, to enable the court to conclude that a substantial claim is presented.  If the allegations are sufficient, and factual issues are raised, a hearing is required."  Citing *Cohen v. United States*, 378

---

[19] The Ninth Circuit is silent as to whether a *Monsanto* hearing requires a probable cause determination on the underlying crimes and the Supreme Court has not yet addressed the split among other circuits.  *See Kaley*, 133 S.Ct. 1580.

[20] The Supreme Court has not resolved the issue of what preliminary showing a defendant must make to trigger a post-seizure, adversary hearing.  *See Monsanto*, 491 U.S. 600; *see also Kaley* 133 S.Ct. 1580.  However, other circuits have found that a defendant is entitled to a *Monsanto* hearing only when he has sufficiently demonstrated that he has no unseized assets with which to pay his counsel of choice. *See, e.g.*, *United States v. Jones*, 160 F.3d 641 (10th Cir. 1998) (noting defendant may not simply ask for a hearing, but rather, must demonstrate she has no unrestrained assets to pay private counsel); *United States v. Farmer*, 274 F.3d 800 (4th Cir. 2001) (considering three factors of private interest, risk of erroneous deprivation, and Government's interest to determine if a defendant is entitled to a post-seizure, pre-trial adversary hearing); *United States v. E-Gold, Ltd.*, 521 F.3d 411 (D.C. Cir. 2008) (declining to determine whether the due process rights of a defendant compels a hearing when the assets are not necessary to obtaining counsel of choice); *United States v. Yusuf*, 199 Fed.Appx. 127 (3d Cir. 2006) (unpublished) (finding defendant must make a threshold showing that a portion of his restrained assets are untainted and he has no other funds to secure counsel of choice).

[21] Defendants cite to a Second Circuit case that imposes a limited threshold burden in that "a defendant seeking a *Monsanto* or *Monsanto*-like hearing must demonstrate, beyond the bare recitation of the claim, that he or she has insufficient alternative assets to fund counsel of choice."  *United States v. Bonventre*, 720 F.3d 126 (2d Cir. 2013).  The Second Circuit declined to find that defendant must also make a formal prima facie showing that the funds were illegitimately restrained.

F.2d 751, 761 (9th Cir. 1967), *cert. denied*, 389 U.S. 897 (1967); *see also United States v. McCray*, 113 Fed.Appx. 770 (9th Cir. 2004) (unpublished).

The Court has given Defendants ample opportunity to demonstrate that they have insufficient unrestrained assets to fund defense with counsel of choice. Substantial written briefing has been accepted by the Court. *See* Omnibus Motion (#65), Government's Response (#84), Defendants' Reply (#90), Defendants' Supplement (#122), Litwin's Financial Affidavit (#125), Defendants' Brief (#127), Exhibits (#128-#129), and Government's Memorandum (#130). In addition, the Court heard arguments related to this issue during an evidentiary hearing conducted on three separate days. Based on all of the evidence presented, the Court finds that Defendants have failed to make the preliminary showing required to demonstrate that they are unable to retain their counsel of choice without the unseized assets or that some of the seized assets are unrelated to the charges. Accordingly, the Court will deny Defendants' request for a *Monsanto* hearing.

**B.      Litwin's Preliminary Showing**

In Litwin's Omnibus Motion (#65), he initially requested return of seized property to pay attorneys fees by citing *United States v. Wommer*, 2011 WL 5117874 (D. Nev. Oct. 27, 2011). In *Wommer*, the Court noted that the defendant did not challenge the seizure of funds on the grounds that there is no probable cause to support the structuring charges in the indictment or the funds are not subject to forfeiture. 2011 WL 5117874 at *5. Instead, the Court conducted an analysis of the defendant's argument that the forfeiture violates the Eighth Amendment's prohibition against the imposition of excessive fines. In doing so, the Court relied on the four factor test articulated in *United States v. Bajakajian*, 524 U.S. 321, 337 (1998). Accordingly, in Litwin's Omnibus Motion (#65), he failed to make a Fifth or Sixth Amendment challenge based on the seized assets. Moreover, beyond citing the standard for analyzing an Eighth Amendment challenge, he failed to provide any evidence to demonstrate that the seizure constitutes an excessive fine. At this stage, Litwin failed to provide sufficient evidence to warrant a *Monsanto* hearing.

In Litwin's Reply (#90), he added a new argument for return of seized property to pay

33

attorneys fees by citing to *Monsanto*.  However, a general statement that Litwin made a showing of financial need was made without any evidentiary support.  *See* Reply #90, 18.  Instead, Litwin merely stated that the government seized almost all of his assets.  *Id.*  This bare assertion of financial need is insufficient to justify a *Monsanto* hearing.

At the continued evidentiary hearing on the Omnibus Motion (#65) on September 19, 2013, Litwin again raised the issue of needing the seized property to be returned to pay his choice of counsel. *See Minutes of Proceedings* #115.  The Court ordered defense counsel to file an affidavit regarding billing for *in camera* review and provide the Government with a redacted copy.  At this point, the Court again finds that Litwin failed to meet his burden to provide sufficient evidence to trigger a *Monsanto* hearing.

At the third continued evidentiary hearing on the Omnibus Motion (#65) on October 17, 2013, the Court received Litwin's Financial Affidavit and ordered supplemental briefing on the *Monsanto* issue.  *See* Minutes of Proceedings #124; *see also* Sealed Financial Affidavit #125.  In his Affidavit, Litwin indicates earnings of $3,000 per month, spousal earnings of $1,500 per month, and other income received in the past twelve months from Wetselaar in the amount of $36,000.  *Id.*  In addition, Litwin submitted an Affidavit from an employee of his counsel indicating an outstanding balance of $303,210.13 for legal services through September 30, 2013.  *See* Sealed Declaration of Stacy Bowers #126.  This was updated with a subsequent Affidavit from Litwin dated October 31, 2013 indicating that he has an outstanding balance of $112,805.07 through September 30, 2013.  *See* Sealed Exhibit A (#128).  Litwin also provided a supplemental brief prior to the hearing that clarified that he was making an Eighth Amendment claim of excessive forfeiture in addition to a Fifth and Sixth Amendment challenge.  *See* Supplement #122, 10.  Notably, Litwin failed to provide any new argument or evidence to demonstrate how he meets the four factor test articulated in *Bajakajian* to constitute a violation of the Eighth Amendment's prohibition against the imposition of excessive fines.  However, the Court notes that, like in *Wommer*, Litwin's Eighth Amendment challenge is premature because Litwin will have an opportunity to challenge the requested forfeiture on Eighth

34

Amendment grounds if he is convicted.  2011 WL 5117874 at *7.  Moreover, the burden is on Litwin "to establish, on the basis of the undisputed facts, the maximum amount of forfeiture that could reasonably be imposed in accordance with the Eighth Amendment's prohibition against excessive fines." *Id.* at *8.  Therefore, the Court finds that Litwin has failed to meet his burden with respect to the return of seized funds pursuant to the Eighth Amendment.

Furthermore, the only evidence Litwin produced to meet his preliminary showing for a *Monsanto* hearing is a Financial Affidavit (#125), Declaration from an employee of his counsel detailing the legal fees (#126), and Affidavit of legal fees (#128, 2).  However, the Court notes that it previously conducted a hearing on Defendants' Motion for Hearing Concerning Possible Sixth Amendment Violations (#53) and issued a Report and Recommendation noting a conflict of interest due to the joint representation of Litwin and Wetselaar.  *See* Sealed Report and Recommendation #62, 10.  Further, the Court conducted two hearings regarding the Government's Motion for Rule 44(c) Hearing or Disqualification (#63) where it thoroughly canvassed Litwin and Wetselaar to determine that they were informed regarding the potential conflict of interest and obtained a waiver of the conflict of interest.  *See* Minutes of Proceedings #81 and #87.  In doing so, the Court was informed that it is a joint defense and Wetselaar is paying the cost of defense for Litwin.  As such, the Court cannot find that Litwin is being deprived of his right to counsel of choice because of his seized assets.  Therefore, the Court finds that Litwin has failed to make a preliminary showing that he is deprived of his right to counsel of choice because of his seized assets and a *Monsanto* hearing is not warranted.[22]

### C.    Wetselaar's Preliminary Showing

Similar to Litwin, in Wetselaar's Omnibus Motion (#65), he initially requested return of seized property to pay attorneys fees by citing *Wommer*.  2011 WL 5117874.  Besides citing the standard for an Eighth Amendment excessive fine challenge, Wetselaar generally states that most of his assets

---

[22] In the event Litwin's agreement with Wetselaar changes, then it may be appropriate for him to renew his motion for a *Monsanto* hearing with clarification of all of his unseized assets, the attorney bill he is responsible for, and the total seized assets attributable only to him rather than Wetselaar.

accumulated over 50 years of medical practice were seized.  Without any evidentiary support, this statement is insufficient to demonstrate that the seizure constitutes an excessive fine based on the four *Bajakajian* factors or warrant a *Monsanto* hearing.

Likewise, in Wetselaar's Reply (#90), he added a new argument for return of seized property to pay attorneys fees by citing to *Monsanto*.  However, Wetselaar merely reiterated that he demonstrated financial need because almost all of his assets accumulated over fifty years of medical practice were seized.  *See* Reply #90, 18.  Wetselaar failed to articulate the entire universe of his assets, the amount seized, and the amount not seized that is available to pay his choice of counsel.  Therefore, Wetselaar's bare assertion of financial need is insufficient to justify a *Monsanto* hearing.

In Wetselaar's supplemental brief (#122) submitted prior to the final evidentiary hearing on the Omnibus Motion (#65), he stated that he has expended a significant amount of assets in retaining and paying chosen counsel.  He also indicated that because the length of the representation and complexity of the case, Wetselaar would be prejudiced if new, court-appointed counsel were to be substituted. *See* Supplement #122, 13.  Like Litwin, Wetselaar submitted a Declaration from an employee of his counsel indicating an outstanding balance of $303,210.13 for legal services through September 30, 2013.  *See* Sealed Declaration of Stacy Bowers #126.  He also submitted an updated Affidavit that he has an outstanding balance of $190,405.06 through September 30, 2013.  *See* Sealed Exhibit B #129, 2.  Further, Wetselaar submitted a Declaration of his net worth and cash flow statement.  *See* Sealed Exhibit B #129, 4-12.  He indicates $166,000 of assets in bank accounts, approximately $25,000 in investments, $3,000 in motor vehicles, $333,000 in real estate, $7,000 in art, $3,000 in anticipated settlement funds, $70,000 in trust assets, and $10,000 in business holdings.  *Id.* at 5-7.  Wetselaar also indicates that he receives income from Social Security and pensions, but his net monthly cash flow is $740.  *Id.* at 11-12.  However, he does not provide spousal information regarding securities stating it is "not applicable" despite Nevada being a community property state.  *Id.* at 5.  Wetselaar also failed to

36

provide personal or S Corporation income tax returns stating they are "not applicable." *Id.* at 8.[23]

Based on Wetselaar's representations as to his assets and his failure to provide tax return information or spousal securities income, the Court finds that he has failed to provide "sufficiently definite, specific, detailed, and nonconjectural" evidence to justify a *Monsanto* hearing.  The vast majority of Wetselaar's evidence consists of conclusory statements that he does not have sufficient assets to pay his choice of counsel.  However, the declaration of net worth and cash flow statement is incomplete as to all of Wetselaar's unseized assets.  *See* Sealed Exhibit B #129, 4-12.  The Court is unable to determine what his business income has been without the tax return information.  Also, the Court cannot find that he is unable to pay his choice of counsel without knowledge of all of his spouse's property, which would constitute community property assets.  Moreover, Wetselaar failed to submit any evidence tying specific seized assets to legitimate, untainted activity that is not traceable to the commission of the offenses charged in this case.[24]

Also, the Government contends that Wetselaar has equity in his primary residence that could be leveraged to pay for counsel, vacation or rental properties that could be sold, deposits in foreign bank accounts that could be accessed, cash or other assets that were not seized, and familial or community assets.  Assuming Wetselaar is paying the entire remaining attorney fees bill of $303,210.13 minus the retainer of $95,000 for a total of $208,210.13, he has sufficient assets in terms of bank accounts, investments, real estate, art, and trust to pay the bill.  In fact, Wetselaar has already paid the retainer of $95,000 and the Court finds that the remainder of the bill can be satisfied with the

---

[23] Wetselaar noted in his supplemental brief that he filed his Declaration of net worth and cash flow statement (#129) under seal with supporting paperwork to be filed with the Court ex parte to "avoid further overreaching by the Government." *See* Supplemental Brief #127, 4, fn. 2.  However, Wetselaar failed to seek leave of the court to request that additional *in camera* submissions be allowed.  Given the numerous opportunities that the Court provided to Wetselaar to submit sufficient evidence regarding his unseized assets, it is not the Court's burden to request further evidence.

[24] Although the Court acknowledges that the Ninth Circuit has not found that a defendant must establish that a portion of the assets seized are untainted to justify a *Monsanto*, the Court finds such evidence persuasive to satisfying the preliminary showing burden.  This is an alternative type of evidence that could have been provided by Defendants, but was never presented to the Court.

assets described on Wetselaar's incomplete Declaration.  The need for this calculus of whether a defendant can demonstrate to the Court's satisfaction that he has no unseized assets to retain private counsel is obvious.  If the defendant fails to persuade the Court on this point, then a *Monsanto* hearing is premature.  The Government is not required to reestablish probable cause without the defendant first meeting this initial burden.  Indeed, a Sixth Amendment concern is not raised until the unseized assets are exhausted or counsel represent that he or she is unable to continue the representation due to a lack of funds.  *See United States v. Ray*, 731 F.2d 1361 (9th Cir. 1984) (finding defendant failed to show restraining order freezing his assets interfered with his Sixth Amendment right to counsel because he chose to retain counsel and continued to have that counsel of choice through court appointment).  Accordingly, Wetselaar has failed to meet the evidentiary threshold to demonstrate his inability to compensate chosen counsel from unseized funds available to him.

### D.   Conclusion

As discussed above, the Court has given Defendants numerous opportunities to demonstrate that they have insufficient unseized assets to fund their defense with counsel of choice.  In addition to written briefing, the Court heard oral argument, and accepted sealed exhibits regarding Defendants financial status.  After careful consideration of all of the evidence, the Court finds that Defendants have failed to make the preliminary showing required to warrant a *Monsanto* hearing.  In order to challenge the probable cause and traceability of the seized assets, the Defendants are required to present sufficient evidence that they are unable to afford counsel of choice in violation of the Fifth and Sixth Amendments.  Only after making a preliminary showing are defendants entitled to a traceability challenge in the form of a *Monsanto* hearing.  The Court finds that Litwin has failed to make the preliminary showing and he previously represented that he is not contributing financially to his current counsel of choice.  Additionally, the Court finds that Wetselaar has not presented sufficient evidence to evaluate the extent of his unseized assets.  Alternatively, Defendants failed to present any evidence to the Court of seized assets that were untainted.  The Court finds that it would be premature to grant Defendants' request for a *Monsanto* hearing when they have not demonstrated that their unseized

assets are exhausted and have no other means to pay for their choice of counsel.  Therefore, based on the evidence provided to the Court at this time, a *Monsanto* hearing is not warranted and the seized property should not be returned.

Based on the foregoing and good cause appearing therefore,

## **RECOMMENDATION**

**IT IS HEREBY RECOMMENDED** that the remaining portions of Defendant Henri Wetselaar, M.D., and Defendant David Litwin's Omnibus Motion (#65) be **denied**, as set out more specifically below.

**IT IS FURTHER RECOMMENDED** that Defendant Henri Wetselaar, M.D., and Defendant David Litwin's Motion for Suppression of Evidence contained within their Omnibus Motion (#65) be **denied**.

**IT IS FURTHER RECOMMENDED** that Defendant Henri Wetselaar, M.D., and Defendant David Litwin's Motion for Return of Seized Property and Assets Pursuant to Rule 41(g) contained within their Omnibus Motion (#65) be **denied**.

**IT IS FURTHER RECOMMENDED** that Defendant Henri Wetselaar, M.D., and Defendant David Litwin's Motion for Return of Seized Property and Assets to Pay Legal Fees contained within their Omnibus Motion (#65) and their request for a *Monsanto* Hearing contained within their Supplemental Memorandum (#130) be **denied**.

## **NOTICE**

Pursuant to Local Rule IB 3-2 any objection to this Report and Recommendation must be in writing and filed with the Clerk of the Court within 14 days. The Supreme Court has held that the courts of appeal may determine that an appeal has been waived due to the failure to file objections within the specified time. *Thomas v. Arn*, 474 U.S. 140, 142 (1985).  This circuit has also held that (1) failure to file objections within the specified time and (2) failure to properly address and brief the objectionable issues waives the right to appeal the District Court's order and/or appeal factual issues from the order of the District Court. *Martinez v. Ylst*, 951 F.2d 1153, 1157 (9th Cir. 1991); *Britt v.*

1    *Simi Valley United Sch. Dist.*, 708 F.2d 452, 454 (9th Cir. 1983).

2           DATED this 31st day of December, 2013.

3

4                                    _____

5                                    **C. W. Hoffman, Jr.**
                                     **United States Magistrate Judge**

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

40