1
2
3
4
5
6
7
8
9

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

10  UNITED STATES OF AMERICA,

11          Plaintiff,                              Case No. 2:11-CR-00347-KJD-CWH

12  v.                                              **ORDER**

13  HENRI WETSELAAR, M.D., *et al*.,

14          Defendants.

15

16          Before the Court is the Magistrate Judge's Report and Recommendation (#132) regarding

17  Defendants' Omnibus Motion (#65). Defendants objected (#138), the Government objected and

18  responded (#139), and Defendants replied (#140). The Government also provided a separate notice

19  of Intervening Supreme Court Decision (#141). It should be noted that a portion of Defendants'

20  underlying motion was addressed and denied in this Court's prior Order (#118).

21          This case presents a host of nuanced and difficult issues. While the general contours of the

22  relevant facts are laid out in the Factual Background section, additional facts will be discussed in the

23  sub-sections to which they pertain. Finally, the Court notes that Defendants liberally employ the

24  shotgun approach, often asserting (or at least implying) alternative legal theories from one paragraph

25  to the next, often devoid of citations to authority. The Court finds all such mere assertions violate

26  Local Criminal Rule 47-9, and therefore the Court cannot and will not consider them.

I. Factual Background

Dr. Henri Wetselaar ("Wetselaar") is a physician practicing in Las Vegas, Nevada, and employs co-defendant David A. Litwin ("Litwin") as his medical assistant (#104 at 138 ll. 6-12). The Government indicted Defendants for illegal drug distribution, money laundering, the structuring of transactions to evade reporting requirements, conspiracy to distribute a controlled substance, etc. (#4 at 2). On August 27, 2010, agents applied for and obtained a search warrant for Defendants' medical practice, which authorized the seizure of "[p]atient files and/or medical records maintained by Wetselaar, Litwin or [the medical practice], or their employees, for patients who received prescriptions for controlled substances." (Hearing before Magistrate Hoffman, 19 Sept. 2013, Ex. A-1; see also #65 at 8 ll.11-15). This warrant was executed on August 31, 2010 (Hearing before Magistrate Hoffman, 19 Sept. 2013, Ex. A-3). It is undisputed that the agents seized all of Wetselaar's patient medical records (#104 at 119; #123 at 33). Wetselaar used three different suites in his practice, and all three were searched, ##102, 105, and 107. Cash (as opposed to insurance) patient files were found in suites 107 and 102 (#123 at 39; #104 at 152-53). The agents involved described the seizing of all files as motivated by time and manpower constraints which made it impractical to filter the relevant files on-site (#104 at 119-120). This was likely exacerbated by the disorganized state of the files (#104 at 153-154; #123 at 39-40). No reliable estimate of the number of records seized, or of the proportion of records containing prescriptions for controlled substances has been submitted to the Court.[1]

On September 29, 2011, Government agents executed a search of Wetselaar's residence, seizing among other items, a plastic bag containing four safe deposit box keys and various notations including "Total about 150 gold coins" as well as numeric and alpha-numeric sequences (#68, Ex. 9 at 13 ll. 11-15). Defendants do not challenge either this warrant or this seizure here. The agents had

---

[1]This particular shortcoming will be addressed in greater detail below.

previously been informed that Wetselaar purchased gold from American Coin Express ("ACE") (#104 at 162 ll. 18-24).

That same day, the agents noticed that ACE was located in the same shopping center as 24/7 Private Vaults ("PV") and decided to stop by (#104 at 162 ll. 18-24; #123 at 63-64). Agents thought it likely that the keys belonged to vaults located at PV based on "common understanding" in the law enforcement community and the general appearance of the keys and notations (#123 at 218 ll. 12-21). Upon arrival, the agents successfully accessed the front door to PV by entering one of the notations found in the plastic bag into the keypad (#123 at 64 ll. 13-14). It appears that upon the successful entry of the code, an employee of PV "buzzed" the agents into the building (#123 at 64-65).

Upon entering PV, the agents approached Sylviane Cordova ("Cordova") (#123 at 65-66). They then proceeded to show her the keys, at which time Cordova identified them as belonging to vaults there at PV (#123 at 66; #104 at 11-12). Cordova then proceeded to lead the agents through the various security doors and back into the "VIP room" which contained a large number of vaults (#104 at 13, 42; #123 at 66). Then, either Cordova or the agents used the keys to open three vaults which belonged to Defendants, revealing the metal liners (#123 at 66-67; #104 at 13-14, 47). Cordova then suggested that the metal liners be relocated to the floor vault, beyond Defendants' access (#104 at 48 ll. 12-20; #123 at 86 ll. 23-25). The agents then helped Cordova relocate the boxes from the wall vaults into a floor safe (#123 at 87; #104 at 49). Cordova then provided the agents with the combination to the large floor safe (#104 at 52-53; 123 at 89). The agents then secured the floor safe with evidence tape (#123 at 89; #104 at 57, 61). The agents never opened the metal liners during this visit (#104 at 55; #123 at 134). Sometime after the agents had left, Cordova contacted the agents and told them that she had identified a fourth vault belonging to Defendants and that she had placed small metal screws in the locking mechanism to secure the vault (#123 at 139-40).

On October 3, 2011, the agents applied for, obtained, and executed a search warrant for the three vaults originally discovered (#123 at 94, 140). The warrant was based on two affidavits.

1   (Hearing before Magistrate Hoffman, 19 Sept. 2013, Ex. I-2 at 1, 4 ll. 14-16). Agent Norris' prior

2   affidavit incorporated by reference does not reference any of the activities at, information gained

3   from, or even the existence of PV (Hearing before Magistrate Hoffman, 19 Sept. 2013, Ex. B-2).

4   Agent Norris' second affidavit explains how agents arrived at PV, entered the code in the key pad at

5   the front door, and were granted access to the lobby (Hearing before Magistrate Hoffman, 19 Sept.

6   2013, Ex. I-2 at 6-7). The affidavit further discloses than an employee of PV identified the keys as

7   likely belonging to PV vaults with some specificity. (Hearing before Magistrate Hoffman, 19 Sept.

8   2013, Ex. I-2 at 7 ll. 1-4). No further reference is made to PV or to activities occurring there. Upon

9   execution, Agents discovered U.S. currency, foreign currency, as well as silver and gold coins within

10  these vaults (Hearing before Magistrate Hoffman, 19 Sept. 2013, Ex. I-3). On October 5, 2011, the

11  agents applied for, obtained, and executed a search warrant for the fourth vault secured via metal

12  screws by Cordova, in which agents found both U.S. currency and three gold coins (Hearing before

13  Magistrate Hoffman, 19 Sept. 2013, Ex. J-3).

14  II. Untimely Government Objections

15      The rules governing the timing of objections to a magistrate's findings and recommendation

16  are found in 28 U.S.C. § 636(b)(1)(C) (2012). Fourteen days are provided for "any party" to file

17  objections. Id. This Court's local rules are identical on this point. LR IB 3-2 (2014). The local rules

18  also provide an additional fourteen days for a party to file points and authorities opposing any

19  objections. Id. Here, the Finding and Recommendation was entered on December 31, 2013, and the

20  parties were given until January 17, 2014 to file their objections (#132). Subsequently, the Court

21  granted an extension of time (#136) based on the parties' stipulation (#134), making the objection

22  due February 3, 2014 (#136). Defendants timely filed their objections (#138). However, the

23  Government filed nothing until February 20, 2014, which is styled "Opposition to Defendant's [sic]

24  Objections" (#139). Defendants then timely replied to the Government's opposition (#140).

25      However, despite these shortcomings, the Court is unable to find any prejudice to Defendants

26  in construing the Government's filing as both an opposition and an objection, nor do Defendants

4

1  allege any prejudice. Further, given the courts' strong preference for disposing of matters on their

2  merits, the Court declines to strike the Government's objections as untimely.

3  III. Standard of Review

4       "The district court is in an 'appellate' role when reviewing the magistrate's findings and

5  recommendations; its function is to correct those findings made by the magistrate when the litigant

6  has identified a possible error." United States v. Remsing, 874 F.2d 614, 616 (9th Cir. 1989).

7  Accordingly, the Court's obligation is "to arrive at its own independent conclusion about those

8  portions of the magistrate's report to which objections are made."[2] Id. at 618. Specifically, the Court

9  is to engage in "de novo" review of the findings and recommendations objected to. 28 U.S.C. §

10  636(b)(1)(C) (2012). This requires the Court to review the evidence, and not merely rely upon the

11  magistrate's findings of fact and conclusions of law. Orand v. United States, 602 F.2d 207, 208 (9th

12  Cir. 1979). Consequently, the Court may "accept, reject, or modify, in whole or in part, the findings

13  or recommendations made by the magistrate judge. The judge may also receive further evidence or

14  recommit the matter to the magistrate judge with instructions." 28 U.S.C. § 636(b)(1)(C).

15  IV. Whether a General Search Occurred at Defendants' Place of Business

16       A. Legal Standard

17       The Fourth Amendment protects the public against unreasonable searches and seizures by the

18  Government. U.S. Const. amend. IV. This protection is achieved in part by requiring that warrants

19  "particularly describe the things to be seized mak[ing] general searches under them impossible"

20  Marron v. United States, 275 U.S. 192, 196 (1927). When officers violate the terms of a warrant in

21  execution, two possibilities are before the Court. "[P]artial suppression [meaning suppression of

22  those materials outside the warrant] is the norm . . . ." United States v. Sears, 411 F.3d 1124, 1131

23  (9th Cir. 2005); see also United States v. Tamura, 694 F.2d 591, 597 (9th Cir. 1982) (denying total

24  suppression because officers did not engage in indiscriminate fishing). However, where there is

25  _____

26       [2]The Court must also make an independent determination of credibility, although it may do so by reviewing the record or by holding a hearing. See generally U. S. v. Raddatz, 447 U.S. 667 (1980).

1   "flagrant disregard for the terms of the warrant" all evidence, including untainted evidence, may be

2   suppressed. United States v. Chen, 979 F.2d 714, 717 (9th Cir. 1992). The Ninth Circuit has

3   emphasized that such total suppression is an "extraordinary remedy" applicable only when "the

4   violations of the warrant's requirements are so extreme that the search is essentially transformed into

5   an impermissible general search." Chen, 979 F.2d at 717. In sum, "wholesale suppression is

6   appropriate under the flagrant disregard standard only when the officers transform the search into an

7   impermissible general search by ignoring the terms of the warrant and engaging in indiscriminate

8   fishing." Id. at 717. Importantly, even "wholesale seizures" in excess of the warrant do not result in

9   total suppression where the Government's acts "were motivated by considerations of practicality

10  rather than by a desire to engage in indiscriminate fishing . . . ." Tamura, 694 F.2d at 597.

11      B. Analysis

12      It is undisputed that the Government seized all of Wetselaar's patient files, an act which

13  Defendants argue transformed a valid search under a valid warrant into a constitutionally

14  impermissible general search (#138 at 4 ll.16-18). As noted above, the terms of the warrant are

15  central to this analysis. Under partial suppression, only those items beyond the terms of the warrant

16  will be excluded. Sears, 411 F.3d at 1131. Total suppression is reached only following flagrant

17  disregard for the terms of the warrant. Chen, 979 F.2d at 717. Accordingly, the Court will begin with

18  the terms of the warrant.

19      The warrant flatly authorized the search and seizure of "[p]atient files and/or medical records

20  maintained by Wetselaar, Litwin or [the medical practice], or their employees, for patients who

21  received prescriptions for controlled substances." (Hearing before Magistrate Hoffman, 19 Sept.

22  2013, Ex. A-1 at 5 ll. 1-3; see also #65 at 8 ll.11-15). Such unambiguous terms needs no further

23  clarification, and the Court turns now to the files seized.

24      As noted above, it is undisputed that the Government seized all of Wetselaar's patient files.

25  Accordingly, the normal remedy would be partial suppression of all of those files which did not

26  contain prescriptions for controlled substances. Sears, 411 F.3d at 1131. However, Defendants do not

seek this remedy, and the Court declines to grant it *sua sponte*. The Court also notes that it appears that Defendants seek the partial exclusion of all Medicare patients' files.[3] Clearly this is not justified by the terms of the warrant. Defendants attempt to avoid this obstacle by implying that Medicare patients files *would* have been excluded from the warrant had the supporting affidavits made explicit mention of the existence of Medicare patients at Wetselaar's practice.[4] Such an assertion is plainly and purely irrelevant to the claim that a general search was executed by the Government. Further, the Court disagrees. Where a physician engages in illegal prescription practices, there is no reason to suppose that he or she would tend to exclude Medicare recipients from his or her dealings.

Although Defendants express no interest in the normal remedy of partial suppression, they are keenly interested in the extraordinary remedy of total suppression (#138 at 3 ll. 22-23). This remedy requires that the officers flagrantly disregard the terms of the warrant in order to engage in "indiscriminate fishing" rather than for "considerations of practicality." Chen, 979 F.2d at 717 (discussing the extraordinary nature of the remedy of total suppression); Tamura, 694 F.2d at 597 (allowing for "wholesale seizures" when motivated by "considerations of practicality" and not a desire to engage in "indiscriminate fishing"). Defendants implicitly concede that Wetselaar's practice was primarily "pain management" (#65 at ll. 21-23). Given the nature of the practice, Task Force Officer Still's testimony is wholly credible when she recounts the following:

> Still: He [meaning Wetselaar] asked what we were going to be seizing, and that's when I told him we would take, uh, medical files that - - in which, uh, controlled substances were prescribed.

---

[3]Defendants' reliance on United States v. Medlin is misplaced, as the issue there was the seizure of items not described in the warrant. 842 F.2d 1194 (10th Cir. 1988).

[4]Defendants incorrectly further argue that the terms of the warrant are implicitly limited by TFO Kendra Still's affidavit discussed at a hearing before Magistrate Hoffman (#138 at 4 ll. 20-24). It is undisputed that TFO Still was "focus[ed] on a certain demographic of patients receiving certain types of medications and paying cash for it [sic]." (#123 at 25 ll. 8-10). However, as is evidenced by the above analysis and Magistrate Hoffman's statements and requests for clarification surrounding this issue at the hearing, this fact is far afield from the relevant inquiry. (#123 at 26, 28-30). Importantly, as acknowledged by Defendants, "the warrant speaks for itself." (#123 at 28 ll. 12-13).

1    Question: When you told him that, did he say anything?

2    Still: He said, "Well, then you're pretty much gonna take all of 'em then."

3  (#104 at 155 ll. 16-21).

4    Although no satisfactorily reliable estimate of the number of records seized has been

5  provided, Defendants allege that the number is 2,747. (#122, Ex. A). Screening such a large number

6  of files would take considerable time and manpower, beyond that reasonably available during the

7  execution of the warrant (#104 at 119-20). This was likely exacerbated by the disorganized state of

8  the files (#104 at 153-154; #123 at 39-40). Further, no undisputed evidence of the proportion of files

9  containing prescriptions for controlled substances has been submitted to the Court. The Government

10  has testified that 96% of the seized files contain such prescriptions (#104 at 157 ll. 20-22).[5]

11  Defendants have estimated that only 70% of the files seized contained such prescriptions (#65 at 9 ll.

12  21-23).[6] The Court strongly echoes the Ninth Circuit in urging the Government to take precautionary

13  measures such as "sealing and holding" the documents pending further authorization or obtaining

14  specific authorization for large-scale removal. <u>Tamura</u>, 694 F.2d at 595-96. However, given the

15  nature of the practice, Wetselaar's admission that "pretty much . . . all" of the files contained

16  prescriptions for controlled substances, and the high proportion of files satisfying the terms of the

17  warrant under either parties' analysis, the Court cannot find either flagrant disregard for the terms of

18  the warrant, or that the Government was engaged in indiscriminate fishing.

19    C. Sharing of the Files

20    It is undisputed that the Government provided the seized files to the U.S. Department of

21  Health and Human Services' Office of Inspector General upon that office's request for the purpose of

22  searching for Medicare fraud. As noted by the Magistrate Judge, Defendants' arguments on this

23  _____

24    [5] TFO Still asserts that 96% of the files provided to the Government's expert contained such prescriptions

25  (#100, Ex. Q at 49 ll. 8-11). This statement leaves the Court wondering how this figure compares to that of all files seized.

26    [6] However, no evidence other than Mr. Litwin's "estimates" has been introduced.

ground are wholly unsatisfactory (#132 at 9 n.4). In response, Defendants assert that they have met the admittedly low threshold of Local Rule 49-7 (#138 at 10 n.2).[7] However, if that were true, the mere assertion that "Party X's conduct violated the law as described in case Y" would suffice (#65 at 21 ll.15-18). Such "practice" casts the burden of locating, articulating, and advocating Defendants' position upon the Court. The Court cannot and will not do Defendants' job for them. Defendants' objection on this ground is meritless.

V. Defining the Initial Search and Seizure at PV

    A. The Role of Cordova

    The Fourth Amendment constrains governmental rather than private action. United States v. Goldstein, 532 F.2d 1305, 1311 (9th Cir. 1976). However, the acts of private individuals may be attributed to the government for Fourth Amendment purposes where the individual acted as an instrument or agent of the government. See Coolidge v. New Hampshire, 403 U.S. 443, 487 (1971). Where a defendant seeks to attribute private searches and seizures to the government, the defendant bears the burden of showing the search was governmental action. United States v. Young, 153 F.3d 1079, 1080 (9th Cir. 1998). An individual is an instrument or agent of the government when the government "authorizes, directs and supervises that person's activities and is aware of those activities." United States v. Jones, 231 F.3d 508, 517 (9th Cir. 2000). Accordingly, de minimis or incidental contacts are insufficient to ascribe private acts to public actors. United States v. Walther, 652 F.2d 788, 791 (9th Cir. 1981). Rather, the government must be involved directly as a participant, or indirectly as an encourager. United States v. Gumerlock, 590 F.2d 794, 800 (9th Cir. 1979). Thus, the two "critical factors" under "instrument or agent" analysis are "(1) the government's knowledge and acquiescence, and (2) the intent of the party performing the search." Walther, 652 F.2d at 792.

---

[7]Defendants now clarify that their objection is not to the sharing of files, but the relationship of this sharing to "probable cause and the execution of the search warrant" (#138 at 9 ll. 21-25). However, Defendants have failed to show any relevant temporal, causal, or other relationship between "probable cause and execution" and the sharing of the patient files. Defendants fail to do anything more than assert such a relationship exists. Accordingly, no relief is available on this ground.

i. The Original Three Vaults

It is unclear whether Cordova volunteered or was asked to lead the agents back into the "VIP room." (#104 at 13 ll. 6-10; #104 at 42-43).  It was Cordova's idea to relocate the metal liners from the vaults into the floor safe (#104 at 16 ll. 2-5). The Government further asserts that they told Cordova that she was relocating the safes of "her own accord" and not at the Government's direction (#123 at 80 l. 15-20; #123 at 87 ll. 22-24; #123 at 251-252; #123 at 293). However, the Government helped Cordova to relocate the safes (#123 at 131-132). What is abundantly clear is that the Government was aware of Cordova's actions and did nothing to hinder or prevent them. Accordingly, the Government both had knowledge and acquiesced. Further, it appears clear that Cordova intended to aid the Government in its investigation. Testimony by multiple PV representatives established that PV marketed "privacy, accessibility and confidentiality" to its clientele (#137 at 34 ll. 16-17; #104 at 32, 81). Thus, Cordova was intentionally furthering the Government's purposes rather than any legitimate business purpose with her actions. Accordingly, Cordova's actions regarding the three original vaults is and should be attributed to the Government.

ii. The Fourth Vault

Some time after the agents had left, Cordova placed a call to the agents stating that she had identified a fourth vault belonging to Defendants and that she had placed small metal screws in the locking mechanism to secure the vault (#123 at 139-40). There is no evidence that the agents had requested any such action by Cordova, and it is undisputed that the Government did not know about Cordova's actions until after they had occurred. Accordingly, while Cordova likely retains the same intent as with the three original vaults, the Government did not know of nor acquiesce to Cordova's actions. Thus, Cordova's actions regarding the fourth vault cannot and should not be imputed to the Government.

B. The Search

A search under the Fourth Amendment can occur in two ways. First, under the Katz line of cases, where 1) the individual exhibits an actual expectation of privacy and 2) society is prepared to

recognize that expectation as reasonable. <u>Bond v. United States</u>, 529 U.S. 334, 338 (2000). Second, under the <u>Jones</u> line of cases, when the Government "engage[s] in physical intrusion of a constitutionally protected area in order to obtain information . . . ." <u>United States v. Jones</u>, 132 S. Ct. 945, 951 (2012). Under either line of cases, a core question is whether an individual possessed the ability or right to exclude others. <u>See</u> <u>Rakas v. Illinois</u>, 439 U.S. 128, 149 (1978) (discussing the importance of the ability to exclude others in determining whether a search had occurred); <u>Rawlings v. Kentucky</u>, 448 U.S. 98, 105, 100 S. Ct. 2556, 2561, 65 L. Ed. 2d 633 (1980) (discussing the right to exclude others as central to whether a reasonable expectation of privacy existed); <u>Patel v. City of Los Angeles</u>, 738 F.3d 1058, 1061 (9th Cir. 2013) (finding that the right to exclude leads naturally to a reasonable expectation of privacy). The Supreme Court in <u>Jones</u> emphasized this point: "our very definition of 'reasonable expectation of privacy'" is "an expectation that has a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society." 132 S. Ct. at 951 (internal quotations omitted).

### i. The Common Areas

By definition, the common areas at PV are areas in which Defendants have no reasonable expectation of privacy, precisely because they are "common." These are areas where other clients and members of the public are expected be found. These are areas where Defendants have no right or ability to exclude. Defendants do not exhibit an actual expectation of privacy in these areas, but rather took the additional step of securing their property within individual vaults to which only Defendants possessed the keys. Further, even had Defendants simply left their property in the "VIP room" rather than securing it within individual vaults, and thus manifested an actual expectation of privacy, society is not prepared to recognize such an expectation as reasonable. PV retained the full right and ability to disseminate the access codes to anyone and everyone that they saw fit, or, as in this case, to bypass such security measures. Further, under the <u>Jones</u> standard, even if the common areas are constitutionally protected, Defendants lack standing to challenge the Government's activity

1   in these areas. <u>Rakas v. Illinois</u>, 439 U.S. 128, 134 (1978) ("A person who is aggrieved by an illegal

2   search and seizure only through the introduction of damaging evidence secured by a search of a third

3   person's premises or property has not had any of his Fourth Amendment rights infringed.").

4   Accordingly, no search took place in the common areas.

5                              <u>ii. The Vaults Themselves</u>

6          At the outset, the Court notes that Defendants exhibited an actual expectation of privacy in

7   their vaults to which only they possessed the keys, and that society is very likely prepared to

8   recognize that expectation as reasonable. Further, it appears likely that such a box is constitutionally

9   protected as a primary means of protecting ones' papers and effects. Thus, under either the <u>Katz</u> or

10  <u>Jones</u> analysis, it appears likely that a search occurred.

11         To avoid this conclusion, the Government goes to great lengths to compare the opening of

12  Defendants' vaults with the interception of email and IP addresses (#139 at 3-5). Defendants'

13  strenuously argue that safety deposit boxes are not like email or IP addresses (#140 at 5-7). The

14  Court finds that the Government's position is mistaken. In <u>Forrester</u>, this Circuit held that there is no

15  reasonable expectation of privacy in the "to/from addresses of e-mail messages [or] the IP addresses

16  of websites visited," because such information is "voluntarily turned over in order to direct the third

17  party's servers." <u>United States v. Forrester</u>, 512 F.3d 500, 509 (9th Cir. 2008). In other words, the

18  information is voluntarily relinquished as essential to the services provided. Here, virtually no

19  information was relinquished, and that information was irrelevant to the services provided.

20  Unlocking safety deposit boxes is not like intercepting e-mail or IP addresses.[8]

21         Surprisingly, all parties have omitted the most relevant case law on this question. The Ninth

22  Circuit has held that "inserting a key into [a car door] lock for the purpose of identifying [an

23  individual]" is not an unreasonable search prohibited by the Fourth Amendment. <u>United States v.</u>

24  <u>$109,179 in U.S. Currency</u>, 228 F.3d 1080, 1088 (9th Cir. 2000) (citing with approval  <u>United States</u>

25

26         [8]The Government's reliance on <u>United States v. Perrine</u>, 518 F.3d 1196, 1204 (10th Cir. 2008) adds nothing to
    the analysis, and is not binding on this Court.

                                            12

v. Concepcion, 942 F.2d 1170, 1173 (7th Cir.1991) (finding no Fourth Amendment violation where police inserted keys into lock of apartment door because "the privacy interest [in the keyhole] is so small that the officers do not need probable cause to inspect it"); United States v. DeBardeleben, 740 F.2d 440, 445 (6th Cir.1984) (upholding insertion of a key into a car door lock because it was "merely a minimal intrusion, justified by a 'founded suspicion' and by the legitimate crime investigation")). In stark juxtaposition, "the insertion of the key in the door of [a vehicle] to see if it fit constitute[s] the beginning of the search." United States v. Portillo-Reyes, 529 F.2d 844, 848 (9th Cir. 1975). The Ninth Circuit distinguished this case by noting that in Portillo-Reyes, the officers did "far more than determine whether the key fit the lock . . . . Instead, they used the key to gain access to the interior . . . and conducted a search." United States v. $109,179 in U.S. Currency, 228 F.3d at 1087.

Here, had officers merely tried the keys to see if they fit *without opening the vault door*, strongly analogous case law would likely require the Court to find that no search had occurred. However, as in Portillo-Reyes, agents here did far more than merely see if the keys fit. Instead, the agents opened the vault doors, removed the metal liners, placed them in an alternate safe, and then secured that safe. Accordingly, as in Portillo-Reyes, inserting the keys into the door constituted the beginning of the search.

It is important to note that because Cordova's actions regarding the Fourth Vault are not imputed to the Government, they do not result in a search under the Fourth Amendment.

C. The Seizure

A seizure occurs when "there is some meaningful interference with an individual's possessory interests in that property." United States v. Jacobsen, 466 U.S. 109, 113 (1984). "[A] possessory interest derives from rights in property delineated by the parameters of law" including contract law. United States v. Jefferson, 566 F.3d 928, 934 (9th Cir. 2009).

The Government argues that the opening of the vaults, and the removal of the metal liners into an alternate safe which was secured against Defendants was similar to the brief detentions of

13

packages or luggage which have already been surrendered to service providers for transit (#139 at 2-3). This comparison fails because the possessory interest in a safety deposit box is not like a possessory interest in mailed parcels or checked luggage. In the latter, the owner consents to the viewing, handling, and relocating of the property. In a safety deposit box, an owner does not consent to the viewing, handling, or relocating of the property so secured. Indeed, such consent would vitiate the purpose of safety deposit boxes. Regardless, it appears clear from the nature of the business that Defendant's rights as delineated by the parameters of law included "accessibility" (#137 at 34 ll. 16-17; #104 at 32, 81). Further, as the name of the company implies, such rights existed "24/7." Thus, a seizure occurred when the metal liners were removed from Defendants' vaults and placed in a safe to which Defendants had no access for several days. Lastly, it is irrelevant that Defendants were not actually denied access to their property. The law protects "possessory interests"–which in this case include "24/7" access to Defendants' property–and not merely "actual possession."

Having found that an illegal search and seizure under the Fourth Amendment occurred, the Court now turns to the available remedy.

VI. Exclusion of Evidence Found in Defendants' Vaults at PV

The question before the Court is whether any evidence ought to be excluded as the fruit of an illegal search or seizure, and if so, what evidence. Defendants argue that all evidence gained from any vault should be excluded (#138 at 18 ll. 14-15).

A. Independent Source

i. Sua Sponte Raising of the Exception

The Magistrate analyzed the search and seizure of Defendants' vaults at 24/7 Private Vaults through the lens of the independent source exception to the exclusionary rule. Defendants are correct that the Magistrate did so *sua sponte*. However, Defendants' argument that this *sua sponte* analysis is inappropriate rests upon due process principles; due process simply requires that Defendants have an opportunity to oppose the application of the Independent Source doctrine (#138 at 12 ll. 5-14); see also Wood v. City of San Diego, 239 F. App'x 310, 311-12 (9th Cir. 2007)

14

1   (holding that where a court applies a particular legal theory *sua sponte* it should afford both parties

2   the opportunity to develop the record). As is clear from Defendants' Objections to the Magistrate's

3   Findings and Recommendation, that opportunity has been given and put to use (#138 at 12-16).

4   However, Defendants have not alleged that any additional evidence exists which could alter the

5   applicability of the independent source exception. Accordingly, Defendants' argument on this point

6   is meritless.

7                    ii. Applicability of the Exception

8                    "Evidence obtained as a direct result of an unconstitutional search or seizure is

9   plainly subject to exclusion." Segura v. United States, 468 U.S. 796, 804 (1984). However, the

10  exclusionary rule does not apply if the Government learned of the evidence from an independent

11  source. Id. at 804. Further, the exclusionary rule does not apply to "fruits" of the original evidence if

12  the evidence was "come at by . . . means sufficiently distinguishable to be purged of the primary

13  taint." Wong Sun v. United States, 371 U.S. 471, 488 (1963). In contrast, such fruits will be excluded

14  if they were "come at by exploitation of [the primary] illegality." Id. at 488.

15                   In Segura v. U.S., officers engaged in an initial warrantless entry and security search,

16  both of which were illegal. 468 U.S. 796, 804 (1984). The question before the Court was whether

17  "drugs and the other items not observed during the initial entry and first discovered by the agents the

18  day after the entry, under an admittedly valid search warrant" should be suppressed. Id. at 804. The

19  Supreme Court found that suppression was "not warranted" because "[n]one  of the information on

20  which the warrant was secured was derived from or related in any way to the initial [search]; the

21  information came from sources wholly unconnected with the entry and was known to the agents well

22  before the initial entry." Id. at 814. The Court continued "[n]o information obtained during the initial

23  entry or occupation of the apartment was needed or used by the agents to secure the warrant. Id. at

24  814. Consequently it was "beyond dispute" that an independent source existed "for the discovery and

25  seizure of the evidence now challenged." Id. at 814. As a threshold matter, evidence will not be

26  excluded unless illegal government activity is at least the "but for" cause of the discovery of the

1  evidence. Id. at 815. Here, the Court held that not even this threshold requirement was met. Id. at

2  815.

3          In this case, an illegal search and seizure occurred as discussed above, and the

4  question before the Court is whether the contents of the safety deposit boxes, subsequently

5  discovered under a valid search warrant should be suppressed. The warrant in this case does refer to

6  the visit to PV in this one particular:

7          Given the handwritten notes and the keys that were found in Wetselaar's
           office, together with my familiarity with the 24/7 [PV] business that your
8          Affiant shared with other law enforcement officers . . . [agents] went to 24/7
           Private Vaults on September 29, 2011. Upon arrival at the location, the
9          officers observed a keypad at the main entrance. [Agents] input the numbers
           "40257#" from one of the handwritten notes into the keypad at the main
10         entrance and were granted access to the lobby of the business. [Agents]
           showed the keys to an unidentified employee of 24/7 Private Vaults who
11         recognized the keys as those similar to ones used by 24/7 Private Vaults. The
           employee further indicated that the gold keys appear to be those typically used
12         by 24/7 Private Vaults for dual lock boxes and the silver keys are typically
           used for single lock boxes.
13  (Hearing before Magistrate Hoffman, 19 Sept. 2013, Ex. I-2 at 6-7).

14         As discussed above, no search occurred in the common areas, which included the

15  lobby and exterior of the building. Thus, none of the information on which the warrant was secured

16  was derived from the initial search, but rather was known to the agents before initial entry. No

17  information obtained during the initial search was needed or used to secure the warrant.

18  Consequently, as in Segura, it is beyond dispute that an independent source existed for the discovery

19  and seizure of the evidence now challenged. Here, illegal governmental activity is not even a "but

20  for" cause of the discovery of the evidence. Accordingly, the contents of the vaults will not be

21  excluded as they fall under the independent source exception.

22         B. Exigent Circumstances

23         Even if the independent source exception did not save this evidence from exclusion, exigent

24  circumstances justify the officers' warrantless seizure. Such justification depends on four queries.

25  First, was there probable cause to seize the evidence. Illinois v. McArthur, 531 U.S. 326, 331 (2001).

26  Second, whether the exigencies of the circumstances demand the seizure. Id. at 332. Third, whether

1  officers made reasonable efforts to reconcile their law enforcement needs with the demands of

2  personal privacy. Id. at 332. Fourth, was the seizure imposed for no longer than reasonably necessary

3  for the police, acting with diligence, to obtain the warrant. Id. at 332.[9]

4    Every judge to review the warrant has concluded that probable cause existed to seize the

5  evidence. This includes the issuing Magistrate (Hearing before Magistrate Hoffman, 19 Sept. 2013,

6  Ex. I-1), the Magistrate below who issued the Finding and Recommendation (#132 at 23), as well as

7  this Court. Given the evidence presented, there was a "fair probability" on which "reasonable and

8  prudent people, not legal technicians, act." Florida v. Harris, 133 S. Ct. 1050, 1055 (2013).

9    Turning now to exigency. It is undisputed that the agents could have asked that Defendants be

10  "locked out" of the boxes by disabling their pin codes, retina scan recognition, etc. However, the

11  employee helping the agents said that she lacked the authorization to complete such a lock-out (#123

12  at 78). Agents further testified that they were concerned with "piggybacking" where Defendant might

13  gain access by coming with another individual or even simply following someone closely (#123 at

14  80, 286). Thus, while some exigent circumstances existed, it was unlikely that destruction of the

15  evidence was imminent.

16    Turning to reconciling the needs of law enforcement with personal privacy, the Court finds

17  that the police did so to the extent possible.

18    Turning to the time period of the seizure, an agent testified that he began working on an

19  affidavit for a warrant to search the vaults immediately after leaving PV premises (#123 at 255). This

20  occurred on Thursday, September 29, 2011. The warrant was issued on Monday, October 3, 2011 at

21  9:30am (Hearing before Magistrate Hoffman, 19 Sept. 2013, Ex. I-1). Accordingly, the Court finds

22  _____

23    [9]Defendants argue that because the metal liners were relocated, the description contained in the warrant is
invalid with the result that the execution of the warrant seized articles beyond the terms of the warrant. The Court adopts

24  the finding of the Magistrate that the warrant authorized the search of three boxes "with the [listed] corresponding
assigned number[s]." (Hearing before Magistrate Hoffman, 19 Sept. 2013, Ex. I-1 at 9). Those numbers were still

25  assigned to the relevant liner even after removal. Further, it is the contents and not the box numbers which were at issue
both at present and in the underlying warrant. The Court reminds the Defendants that de minimis non curat lex. See Skaff

26  v. Meridien N. Am. Beverly Hills, LLC, 506 F.3d 832, 840 (9th Cir. 2007) (elaborating upon this "ancient legal maxim").

1   that the agents seized the vaults no longer than reasonably necessary for the agents, acting with

2   diligence, to obtain a warrant.

3          Accordingly, while it is a close case, the Court finds that exigent circumstances justify the

4   seizure and preclude suppression of the evidence found in the vaults.

5   VII. Motion for Return of Property Under Federal Rule of Criminal Procedure 41(g)

6          Federal Rule of Criminal Procedure 41(g) reads :

7   A person aggrieved by an unlawful search and seizure of property or by the
    deprivation of property may move for the property's return. The motion must be filed
8   in the district where the property was seized. The court must receive evidence on any
    factual issue necessary to decide the motion. If it grants the motion, the court must
9   return the property to the movant, but may impose reasonable conditions to protect
    access to the property and its use in later proceedings.
10  Fed. R. Crim. P. 41(g).

11         Such a motion "may be denied if the defendant is not entitled to lawful possession of the

12  seized property, the property is contraband or subject to forfeiture or the government's need for the

13  property as evidence continues." United States v. Van Cauwenberghe, 934 F.2d 1048, 1061 (9th Cir.

14  1991). "It is well-settled that the federal government may defeat a Rule 41(e) motion by

15  demonstrating that the property is subject to federal forfeiture." United States v. Fitzen, 80 F.3d 387,

16  389 (9th Cir. 1996).

17         The Magistrate below found that the property Defendants seek is subject to forfeiture and so

18  the property should not be returned. Defendants have failed to provide any argument or fact that

19  opposes that finding and recommendation. Accordingly, the Court will not address this objection

20  further. Motion **DENIED**.

21  VIII. Motion for *Monsanto* Hearing

22         "Where the defendant shows that the seized or restrained assets are needed to pay for defense

23  counsel . . . the Fifth and Sixth Amendments require that the district court grant defendant [an] . . .

24  adversar[ial] hearing. United States v. Wommer, 2011 WL 5117874 at *4 (D. Nev. 2011). If such a

25  hearing is granted, "the government is required to show that there is probable cause to believe (a) that

26

1    the defendant committed the crime that provides a basis for forfeiture, and (b) that the property

2    specified as forfeitable in the indictment is properly forfeitable." Id. at *4.

3         Here, Defendants have failed to show that the seized or restrained assets are needed to pay for

4    defense counsel. Obvious gaps litter Defendants hand-written and self-reported financial statements.

5    The Magistrate noted that Defendants had failed to provide tax returns to support their showing of

6    need (#132 at 37 ll. 2-13). Defendants reply that "there is no requirement that [Defendants] do so . . .

7    ." (#138 at 20 ll. 21-24). But this misses the point. Defendants' burden is to show the Court that

8    additional assets are needed to pay for defense counsel, whatever form that evidence takes.

9    Defendants' scattered, self-reported, and seriously deficient financial statements simply are

10   insufficient to meet Defendants' burden. Accordingly, this motion is **DENIED** without prejudice.

11   Should Defendants choose to fully and verifiably disclose their assets, the Court will again consider

12   whether sufficient need has been shown to warrant a Monsanto hearing.

13   IX. Conclusion

14        The Court has considered *de novo* all grounds objected to in satisfaction of the Court's

15   burden under 28 U.S.C. § 636(b)(1)(C). The Court **HEREBY ADOPTS AND AFFIRMS** the

16   Magistrate's Finding and Recommendation (#132) in all ways not inconsistent with this Order.

17        DATED this 7th day of April 2014.

18

19

20   _____

21   Kent J. Dawson
     United States District Judge

22

23

24

25

26

                                                19